UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JENNIFER YANG and DANIEL WU,<br><br>Defendants. | Case No. 16-CR-00334-LHK<br><br>**ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN**<br><br>Re: Dkt. Nos. 346, 347, 348 |

Before the Court are Defendants Jennifer Yang and Daniel Wu's motion for judgment of acquittal on count two of the Superseding Indictment, ECF Nos. 346, 348, and Defendants Yang and Wu's motion for judgment of acquittal on count seven of the Superseding Indictment, ECF Nos. 347, 348.  Having considered the filings of the parties, the relevant law, and the record in this case, the Court DENIES Defendants Yang and Wu's motion for judgment of acquittal on Count Two of the Superseding Indictment.  The Court GRANTS Defendants Yang and Wu's motion for judgment of acquittal on Count Seven of the Superseding Indictment.

## I.      BACKGROUND

### A. The EB-5 Visa Program

The EB-5 visa program permits foreigners and their immediate family members to obtain a

1

United States District Court
Northern District of California

path to Lawful Permanent Residency ("LPR") in the United States by investing $1,000,000 in a commercial enterprise.  ECF No. 4, Superseding Indictment ("SI") ¶ 9.  The investment need only be $500,000 if it is invested in certain geographic areas with low employment rates.  *Id.*  After two years in the EB-5 visa program, if the investor's commercial enterprise creates ten or more jobs, United States Citizen and Immigration Services ("USCIS") will lift the restrictions on the investor's temporary residency status and grant the foreigner and her immediate family full LPR status.  *Id.* ¶ 11.

One way to participate in the EB-5 visa program is through the creation of New Commercial Enterprises ("NCE"), which is defined as an investment in a new or existing business that generates new jobs in the United States.  *Id.* ¶ 12.  USCIS permits multiple investors to invest in the same NCE for the purposes of the EB-5 visa program.  *Id.*  However, the job creation requirement remains the same for each investor.  *Id.*  Thus, if two individual investors opt to invest in the same NCE, a total of twenty jobs must be created in order to satisfy the EB-5 visa program's job creation requirement.  *Id.*

The first step to apply for an EB-5 visa is to submit a form I-526, Immigrant Petition by Alien Investor.  *Id.* ¶ 13.  The form I-526 requires the name and biographical data of the proposed investor; the name, address, and description of the investor's commercial enterprise; the date and amount of investment; and the investor's job title and duties.  *Id.*

The form I-526 also requires supporting documentation, such as evidence that the investor has, among other things, established a lawful business entity and invested, or is actively in the process of investing, the required capital.  *Id.* ¶ 14.  Additionally, the investor must provide evidence that the enterprise will create at least ten full-time positions, as defined by USCIS.  *Id.*  Finally, the investor must provide evidence that the investor will be engaged in the management of the commercial enterprise.  *Id.*  The form I-526 requires the investor to "certify, under penalty of perjury under the laws of the United States of America, that this petition and the evidence submitted with it is all true and correct."  *Id.* ¶ 15.

Case No. 16-CR-00334-LHK
ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

1    Upon approval of the I-526 petition, the investor must then file a form I-485, Application

2    for Conditional Permanent Residency Status.  *Id.* ¶ 16.  The form I-485 confers conditional

3    permanent residency status to the investor, and this conditional permanent residency status lasts

4    for two years.  *Id.*  Within 90 days of the second anniversary of the date that the investor received

5    conditional permanent residency status, the investor must finally file a form I-829, Petition by

6    Entrepreneur to Remove Conditions.  *Id.*

7    The form I-829 requests that USCIS grant LPR status to the investor.  *Id.*  Similar to the

8    form I-526, the form I-829 requires the name and biographical data of the investor; the name of

9    the investor's immediate family members that will receive LPR status; the date and amount of the

10   investment; and the number of jobs created by the investor.  *Id.*

11   The form I-829 requires supporting documentation such as evidence that the commercial

12   enterprise exists and was maintained through the period of the investor's conditional permanent

13   residency status.  *Id.* ¶ 17.  The investor must also provide evidence of the number of the full-time

14   employees of the commercial enterprise when the investment was first made, and the number of

15   full-time employees of the commercial enterprise when the form I-829 was submitted.  *Id.*  This

16   proof can consist of documents such as I-9s and W-2s.  *Id.*  The form I-829 is subject to the same

17   penalty of perjury provision as the form I-526.  *Id.* ¶ 18.

18   **B. The Instant Case**

19   On July 28, 2016, a grand jury in the Northern District of California returned an indictment

20   that charged Defendant Yang with three counts: (1) visa fraud, 18 U.S.C. § 1546, (2) mail fraud,

21   18 U.S.C. § 1341, and (3) aggravated identity theft, 18 U.S.C. § 1028A.  ECF No. 1.

22   On October 12, 2017, a grand jury in the Northern District of California returned a

23   Superseding Indictment that charged Defendant Yang with ten counts.  SI ¶¶ 32–42.  Count One

24   alleged a conspiracy to commit visa fraud, mail fraud, aggravated identity theft, and to defraud the

25   United States.  *Id.* ¶¶ 32–34.  Counts Two, Three, and Four alleged visa fraud, 18 U.S.C. §

26   1546(a).  *Id.* ¶¶ 35–36.  Counts Five and Six alleged mail fraud, 18 U.S.C. § 1341.  *Id.* ¶¶ 37–38.

27

28
Case No. 16-CR-00334-LHK
ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

Counts Seven and Eight alleged aggravated identity theft, 18 U.S.C. § 1028A.  *Id.* ¶¶ 39–40.

Finally, Counts Nine and Ten alleged money laundering, 18 U.S.C. § 1957.  *Id.* ¶¶ 41–42.  The

Superseding Indictment also charged Defendant Wu with each of the foregoing Counts except for

Counts Nine and Ten.  *Id.*  ¶¶ 32–40.

On October 15, 2019, Defendant Yang moved to dismiss Counts Two, Three, Four, Five,

Seven, and Eight of the Superseding Indictment.  ECF Nos. 163, 165.   On November 1, 2019, the

Court denied the Defendant Yang's motions to dismiss Counts Two, Three, Four, Five, Seven, and

Eight of the Superseding Indictment.  ECF No. 221.

On October 15, 2019, Defendant Wu moved to dismiss Counts Two, Five, and Seven of

the Superseding Indictment.  ECF No. 173.  On November 7, 2019, the Court denied Defendant

Wu's motion to dismiss Counts Two, Five, and Seven of the Superseding Indictment.  ECF No.

239.

On December 16, 2019, following a twelve-day trial, the jury unanimously returned a split

verdict.  ECF No. 344.  Specifically, the jury unanimously found Defendants Yang and Wu guilty

of Counts One, Two, Four, Five, and Seven of the Superseding Indictment.  *Id.*  The jury also

unanimously found Defendants Yang and Wu not guilty of Counts Three, Six, and Eight of the

Superseding Indictment.  *Id.*  Finally, the jury unanimously found Defendant Yang not guilty of

Counts Nine and Ten of the Superseding Indictment.  *Id.*

On December 27, 2019, Defendant Yang filed the instant motion for judgment of acquittal

on Count Two of the Superseding Indictment.  ECF No. 346 ("Count Two Mot.").  On January 17,

2020, the government opposed.  ECF No. 370 ("Count Two Opp'n").  Defendant Yang did not file

a reply in support of the motion for judgment of acquittal on Count Two of the Superseding

Indictment.

On December 27, 2019, Defendant Yang also filed the instant motion for judgment of

acquittal on Count Seven of the Superseding Indictment.  ECF No. 347 ("Count Seven Mot.").  On

January 17, 2020, the government opposed.  ECF No. 369 ("Count Seven Opp'n").  On January

Case No. 16-CR-00334-LHK
ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

24, 2020, Defendant Yang filed a reply in support of the motion.  ECF No. 372 ("Count Seven Reply").

On December 30, 2019, Defendant Wu moved to join both Defendant Yang's motion for judgment of acquittal on Count Two of the Superseding Indictment and Defendant Yang's motion for judgment of acquittal on Count Seven of the Superseding Indictment.  ECF No. 348.  The Court GRANTS Defendant Wu's motion to join both of Defendant Yang's motions.

## II.        LEGAL STANDARD

### A.  Motion for Judgment of Acquittal

Federal Rule of Criminal Procedure 29 allows a criminal defendant to move for a judgment of acquittal on the grounds of insufficient evidence after the entry of a guilty verdict.  Under Rule 29, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

In deciding a Rule 29 motion, "[t]he district court . . . must bear in mind that it is the jury's exclusive function to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts."  *United States v. Bernhardt*, 840 F.2d 1441, 1448 (9th Cir. 1988).  Additionally, a district court may find that "circumstantial evidence and inferences drawn from it" are sufficient to sustain a conviction.  *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992), *as amended* (June 15, 1992).

## III.      DISCUSSION

Defendants Yang and Wu seek judgment of acquittal as to two different counts of the Superseding Indictment.  First, Defendants Yang and Wu move for judgment of acquittal on Count Two of the Superseding Indictment.  Specifically, Defendants Yang and Wu argue that the government committed a fatal variance from the allegations contained within Count Two of the Superseding Indictment.  Second, Defendants Yang and Wu seek judgment of acquittal on Count Seven of the Superseding Indictment.  Defendants Yang and Wu argue that the government failed

Case No. 16-CR-00334-LHK
ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

United States District Court
Northern District of California

1  to introduce sufficient evidence to enable any rational jury to conclude that Defendants Yang and

2  Wu satisfied the "uses" element of aggravated identity theft beyond a reasonable doubt.  The

3  Court considers each argument in turn.

4  **A.  Motion for Judgment of Acquittal on Count Two of the Superseding Indictment**

5   The jury unanimously found Defendants Yang and Wu to be guilty of Count Two of the

6  Superseding Indictment, which charges the offense of visa fraud, 18 U.S.C. § 1546(a).  SI ¶¶ 35–

7  36.  The visa fraud statute, 18 U.S.C. § 1546(a), provides in pertinent part: "Whoever knowingly

8  makes under oath, or as permitted under penalty of perjury . . . knowingly subscribes as true, any

9  false statement with respect to a material fact in any application, affidavit, or other document

10  required by the immigration laws . . . [is guilty of visa fraud]."  18 U.S.C. § 1546(a).

11   Count Two of the Superseding Indictment alleges that Defendants Yang and Wu made

12  false statements in connection with the "I-829 Petition and Supporting Documents for Investor

13  S.Y."  *Id.* ¶ 36.  "Investor S.Y." is a Chinese national named Shengliang Yang.  Count Seven Mot.

14  at 2 ("The Superseding Indictment alleges that Ms. Yang made false statements in Shengliang

15  Yang's I-829 petition and supporting documents . . . ."); Count Seven Opp'n at 9 (noting that "the

16  I-829 Petition for Shengliang Yang correspond[s] to Count 2 in the Indictment").

17   As discussed, Defendants Yang and Wu move for judgment of acquittal on Count Two of

18  the Superseding Indictment.  Defendants Yang and Wu argue that acquittal is warranted as to

19  Count Two because the government committed a fatal variance.  Specifically, Defendants Yang

20  and Wu claim that the Superseding Indictment charges Defendants Yang and Wu with

21  misrepresentations contained "in Shengliang Yang's I-829 petition and supporting documents

22  filed on or about August 15, 2011.  However, the government adduced different

23  misrepresentations at trial by relying upon documents submitted in response to RFEs [*i.e.*, requests

24  for evidence] that were not included with the initial I-829 petition."  Count Two Mot. at 3.  Hence,

25  Defendants Yang and Wu argue that the government committed a variance that warrants acquittal.

26  *Id.*

27

28
6

1    In response, the government offers two arguments.  First, the government asserts that

2    Defendants Yang and Wu misread the record and that the government did in fact rely on

3    misrepresentations contained within Shengliang Yang's initial I-829 petition.  Hence, the

4    government contends that there was no variance with respect to Count Two.  Count Two Opp'n at

5    9–10.  Second, the government asserts that to the extent there was indeed a variance, the variance

6    did not prejudice Defendants Yang and Wu's substantial rights.  *Id.* at 10–11.  Defendants Yang

7    and Wu did not file a reply and thus fail to respond to the government's arguments.

8    The Court concludes that there was no variance as to Count Two.  The government

9    presented false statements contained within Shengliang Yang's initial I-829 petition, and these

10   false statements were sufficient to support the guilty verdict against Defendants Yang and Wu as

11   to Count Two of the Superseding Indictment.  Accordingly, the Court need not reach the

12   government's alternative argument that to the extent there was a variance, the variance did not

13   prejudice Defendants Yang and Wu's substantial rights.

14   According to Defendants Yang and Wu, the government committed a variance as to Count

15   Two because "the government sought to bootstrap supplemental documents that were submitted in

16   response to Requests for Evidence" from USCIS.  Count Two Mot. at 2.  Specifically, Defendants

17   Yang and Wu contend that "[t]hese documents include (1) payroll records for August 2011

18   identifying William Gonzalez as Sales Director, (2) Mr. Gonzalez' I-9 form, (3) Mr. Gonzalez' tax

19   returns for employment, (4) three copies of an organizational chart, and (5) an employee stock

20   ledger." *Id.*

21   However, as the government explains, Defendants Yang and Wu misread the record.  The

22   I-9 Form and organizational chart that Defendants Yang and Wu cite were in fact filed on or about

23   August 15, 2011 as part of Shengliang Yang's initial I-829 petition.  Indeed, the table of contents

24   of the initial I-829 petition lists the 1-855-Lawyers, Inc. ("1-855-Lawyers") organizational chart

25   and associated I-9 Forms as proof of the ten "full-time qualifying employees" allegedly created by

26   Shengliang Yang's investment.  *See* Trial Ex. 71 at 625 ("Evidence of 10 full-time qualifying

27

28   Case No. 16-CR-00334-LHK
     ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
     FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

1    employees created // N. Organization chart for August and July 2011; Payroll records from

2    04/01/2008 - 07/31/2011 // O. Forms I-9 and ID (passports, permanent resident cards, etc.)").

3    These documents list William Gonzalez as an employee of 1-855-Lawyers.  *See id.* at 1057 (listing

4    William Gonzalez as "Sales Director" in 1-855-Lawyers organizational chart); *id.* at 1129

5    (asserting in I-9 Form that William Gonzalez commenced employment at 1-855-Lawyers on

6    August 8, 2011).

7         At trial, Gonzalez testified that Gonzalez worked for Defendants Yang and Wu for

8    approximately one month, beginning on August 29, 2011.  ECF No. 354 at 743:22–23 ("Q. Okay.

9    What was your start date with the company?  A. August 29th, 2011."); *id.* at 756:7–757:22 ("I was

10   only there for 30 days . . . .").  During that time, Gonzalez understood himself to be an employee

11   of the companies Faayou or A Legal Forms.  *Id.* at 737:1–8 (testifying that Gonzalez believed the

12   job to be to recruit attorneys for "either Faayou.com or A Legal Forms.  Specifically, that's what I

13   understood prior to [the] meeting"); *id.* at 739:18–23 (testifying that Gonzalez heard "no mention"

14   of 1-855-Lawyers during the interview process, but recalling specific memory of A Legal Forms

15   and Faayou).  Gonzalez had not heard of, and had never agreed to work for 1-855-Lawyers.  *Id.* at

16   744:15–17 ("Q. And am I remembering correctly that you said earlier that before starting the job,

17   you had not heard of 1855Lawyers?  A. That's correct."); 745:14–16 (testifying that Gonzalez

18   never "agree[d] to work for a company specifically called 1855Lawyers").

19        When Gonzalez signed the I-9 Form on August 7, 2011, the employer's portion of the form

20   was blank.  *Id.* at 744:8–14 ("I don't recognize this part of the form.  My understanding is that I

21   submitted it with the top portion filled out and that the rest would be completed by the employer.")

22   Gonzalez never saw his I-9 Form with the employer portion filled out with the 1-855-Lawyers

23   information until the prosecution of Defendants Yang and Wu.  ECF No. 355 at 840:16–841:7

24   (testifying that Gonzalez did not see the "I-9 Form with the [1]855Lawyers information filled in at

25   the bottom" until the prosecution of Defendants Yang and Wu).  After starting his job, Gonzalez

26   received instructions regarding Faayou and A Legal Forms.  ECF No. 354 at 746:1–7 (testifying

27

28

United States District Court
Northern District of California

1   that after starting work, Gonzalez received specific instructions regarding Faayou.com and A

2   Legal Forms).

3        Defendant Yang introduced at trial Gonzalez's August 30 and 31, 2011 emails to

4   Defendants Yang and/or Wu in which Gonzalez identified himself as "Regional Sales Manager,

5   Faayou.com." ECF No. 355 at 825:10–827:4 ("Q. Okay.  And I'd like to focus you to the bottom

6   of that e-mail.  Can you tell the jury what that says?  A. 'Regional Sales Manager, Faayou.com.'").

7   Defendants Yang and Wu never corrected Gonzalez that Gonzalez's employer was actually 1-855-

8   Lawyers.  *Id.* at 844:15–18 ("Q. The question was, in response to those e-mails, did Ms. Yang or

9   Mr. Wu ever correct you and say, 'No, actually, your employer is 1855Lawyers?'  A.  No.").

10       Shengliang Yang's initial I-829 petition also included the I-9 Form for Belen Barragan.

11   Trial Ex. 71 at 1125.  The I-9 Form stated that Belen Barragan was an employee of 1-855-Lawyers

12   beginning on June 25, 2011.  *Id.*  However, at trial, Barragan testified that around that date, in late

13   June 2011, Barragan was in fact hired to work as a housekeeper for Defendants Yang and Wu.

14   ECF No. 354 at 550:19–22 ("Q. What was your job title when you worked for Jennifer Yang and

15   Daniel Wu?  A. Just housekeeping for them.  I didn't really get a job title.").  Barragan testified

16   that the job consisted of cleaning the homes of Defendants Yang and Wu, delivering lunch and

17   groceries, and performing meal preparation.  *Id.* at 549:15–21 (outlining responsibilities).

18   Barragan testified that the job was not full-time and lasted no longer than two months.  *Id.* at

19   544:16–17 ("Q. Okay. But it was not full-time?  A. No."); *id.* at 557:18–20 ("Q. And let me ask,

20   for how long did you work for Ms. Yang and Mr. Wu?  A. No longer than two months.").

21       Barragan testified that during this period Barragan understood that she worked for

22   individuals and not for a company.  *Id.* at 566:20–22 ("Q. In your mind, did you work for a

23   company or did you work for individuals?  A. I worked for individuals.").  Indeed, Barragan

24   testified that she had never heard of a company called 1-855-Lawyers before she started working

25   as the housekeeper for Defendants Yang and Wu.  *Id.* at 547:18–25 ("Q. Okay.  Before you started

26   the job, did you understand anything about what the business 1855Lawyers was?  A. No.  Q. Had

27

28

United States District Court
Northern District of California

9

United States District Court
Northern District of California

1    you heard of the business 1855Lawyers?  A. No, never.  Q. Before you started working, did

2    anyone mention the name 1855Lawyers to you?  A. No.").  Barragan also testified that Barragan

3    never learned what the company 1-855-Lawyers did.  *Id.* at 568:22–25 ("Q. Okay.  Throughout

4    your entire time working for Ms. Yang and Mr. Wu, did you ever come to understand what the

5    company did, what [1]855Lawyers did?  A. No.").

6         The I-9 Forms of Gonzalez and Barragan were both presented to the jury.  *Id.* at 547:8–20

7    (discussing Barragan I-9 Form and the statement that Barragan was employed by 1-855-Lawyers);

8    *id.* at 744:3–7 (discussing Gonzalez I-9 Form and the statement that Gonzalez was employed by 1-

9    855-Lawyers).  In fact, the government specifically referenced Barragan's I-9 Form during closing

10   argument as evidence that Defendants Yang and Wu were guilty of Count Two of the Superseding

11   Indictment.  ECF No. 363 at 2419:15–16 ("And there's a, for example, a false I-9, which is Belen

12   Barragan's I-9.  That's at page 1125.").  In light of the foregoing testimony, a rational jury could

13   have concluded that the statements contained within the I-9 Forms of Gonzalez and Barragan that

14   the two individuals were employed to work at 1-855-Lawyers were false.

15        Gonzalez's and Barragan's I-9 Forms were contained within Shengliang Yang's I-829

16   petition filed on or about August 15, 2011, as specified by the Superseding Indictment.  SI ¶ 36

17   (charging visa fraud based on misrepresentations in "I-829 Petition and Supporting Documents for

18   Investor S.Y.," filed on or about August 15, 2011); Trial Ex. 71 at 625.  However, in any event,

19   the government's expert also testified that an I-829 petition is not a "static document that's frozen

20   in time on the date of its submission."  ECF No. 353 at 428:4–12.  Thus, "from the time of filing

21   through final adjudication, [USCIS] accept[s] any additional evidence filed by the petitioner,"

22   which is incorporated into the I-829 petition.  *Id.*

23        Defendant Wu swore under penalty of perjury as to the truth of the fraudulent statements

24   contained within Gonzalez's and Barragan's  I-9 Forms.  Trial Ex. 71 at 1125, 1129.  The

25   government also elicited expert USCIS testimony that the I-9 Forms were required by USCIS as

26   part of the EB-5 process.  ECF No. 353 at 385:7 (explaining that witness served as "subject matter

27

28   Case No. 16-CR-00334-LHK
     ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
     FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

expert for stand alone EB-5 petitions"); *id.* at 427:17–23 ("Q. I think you mentioned earlier that you had been involved in the adjudication of a thousand or more EB-5 stand alone petitions. Is that correct?  A. Yes.  Q. In that set, how many of those, if you remember, were successfully granted without including I-9 Forms?  A. I can't think of any.").  Finally, the government argued, and put forth sufficient evidence to show, that Defendant Yang aided and abetted Defendant Wu in making the false statements on the I-9 Forms.  *See, e.g.*, ECF No. 363 at 2419:20–25 ("The defendants may argue to you that it was only Daniel Wu that [signed the I-9 Forms] and not Ms. Yang.  But you were instructed, and I anticipate that you'll have this instruction with you, that if one defendant aided and abetted the other in the commission of a crime, that is sufficient to find that they, too, committed the crime.").

The Ninth Circuit has specified that a variance only occurs when "the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Hartz*, 458 F.3d 1011, 1020 (9th Cir. 2006).  In the instant case, as the foregoing demonstrates, the government put forth sufficient evidence to prove the facts alleged in the Superseding Indictment as to Count Two.  *See, e.g.*, *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (explaining that "when faced with a record of historical facts that supports conflicting inferences, a reviewing court must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution" (internal quotation marks and citation omitted)).  Thus, there was no variance as to Count Two of the Superseding Indictment.  *See, e.g.*, *United States v. Antonakeas*, 255 F.3d 714, 722 (9th Cir. 2001) (explaining that there was no variance because "the evidence adduced and theories asserted at Appellant's trial covered the facts and time frame alleged in his indictment").

Accordingly, the Court DENIES Defendants Yang and Wu's motion for judgment of acquittal on Count Two of the Superseding Indictment.  The Court now turns to Defendants Yang and Wu's motion for judgment of acquittal on Count Seven of the Superseding Indictment.

Case No. 16-CR-00334-LHK
ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

### B. Motion for Judgment of Acquittal on Count Seven of the Superseding Indictment

The jury also unanimously found Defendants Yang and Wu to be guilty of Count Seven of the Superseding Indictment, which charged the offense of aggravated identity theft, 18 U.S.C. § 1028A. SI ¶¶ 39–40.  The aggravated identity theft statute, 18 U.S.C. § 1028A, dictates that "[w]hoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." 18 U.S.C. § 1028A(a)(1).  The "felony violation[s] enumerated in subsection (c)" include mail fraud.  18 U.S.C. § 1028A(c).

The Superseding Indictment alleges that Defendants Yang and Wu committed aggravated identity theft in the "I-829 Petition and Supporting Documents for Investor S.Y.," but the Superseding Indictment does not specify the third-party victim.  SI ¶¶ 39–40.  However, the verdict form specifies that the jury found Defendants Yang and Wu guilty of aggravated identity theft through "the use of *William Gonzalez's identity* in the I-829 Petition and Supporting Documents for Investor Shengliang Yang during and in relation to committing mail fraud."  ECF No. 305 at 4 (emphasis added).

According to Defendants Yang and Wu, none of Defendants Yang and Wu's misrepresentations as to Gonzalez "qualify as 'uses' of a means of identification" under 18 U.S.C. § 1028A.  Count Seven Mot. at 5.  The government responds that Defendants Yang and Wu satisfied the "uses" element because Defendants Yang and Wu undertook several actions on behalf of Gonzalez through forgery and impersonation in the course of commission of the fraudulent scheme.  Count Seven Opp'n at 11.  The Court first addresses the scope of the "uses" element of the aggravated identity theft statute.  The Court then applies the "uses" element to the facts of the instant case.

### 1. The "Uses" Element of Aggravated Identity Theft

The Ninth Circuit examined the nature of the "uses" element of aggravated identity theft in two recent cases.  Specifically, the Ninth Circuit first addressed the scope of the "uses" element of

12

aggravated identity theft in *United States v. Hong*, 938 F.3d 1040 (9th Cir. 2019).  In *Hong*, the defendant, an owner of several massage and acupuncture clinics, misrepresented massages that patients received as physical therapy in order to qualify for Medicare reimbursement and thus commit Medicare fraud.  *Id.* at 1051.  The Ninth Circuit relied on several out-of-circuit lines of cases to hold that these misrepresentations did not constitute "uses" of a means of identification for the purposes of the aggravated identity theft statute.  *Id.* at 1050–51.  Accordingly, the Ninth Circuit reversed the aggravated identity theft convictions.  *Id.*

The Ninth Circuit again addressed the "uses" element of the aggravated identity theft in *United States v. Gagarin*, 950 F.3d 596 (9th Cir. 2020).  In *Gagarin*, the Ninth Circuit construed *Hong* to hold that a defendant "uses" a means of identification for the purposes of aggravated identity theft within the Ninth Circuit if the defendant attempts to pass themselves off as the third party.  *Id.* at 603 ("We reasoned that neither Hong nor the physical therapists complicit in his scheme attempted to pass themselves off as patients." (internal quotation marks and alterations omitted)).  A defendant also "uses" a means of identification if the defendant purports to take an action on the third party's behalf through impersonation or forgery.  *Id.* ("Nor did [the defendant in *Hong*] purport to take some other action on another person's behalf through impersonation or forgery." (internal quotation marks and alterations omitted)).

In *Gagarin*, the defendant forged a victim's signature on an insurance application, which falsely conveyed that the victim herself had certified the application.  *Id.* at 603–04.  The Ninth Circuit held that the defendant therefore "purported to take action on behalf of [the victim], and in so doing used [the victim's] identity to further the fraudulent insurance application."  *Id.* at 603.  The Ninth Circuit also held that the defendant "'attempt[ed] to pass [herself] off'" as the victim "through forgery and impersonation."  *Id.* at 604 (quoting *Hong*, 938 F.3d at 1051).  Accordingly, the Ninth Circuit affirmed the defendant's aggravated identity theft convictions.  *Id.*

Following the Ninth Circuit's decisions in *Hong* and *Gagarin*, a defendant commits aggravated identity theft when the defendant purports to take an action on behalf of a victim and

13

United States District Court
Northern District of California

1    when the defendant attempts to pass themselves off as a victim.  *Id.*  The Ninth Circuit has

2    provided some guidance as to how to conduct this inquiry.  Where a defendant provides a service

3    "to [victims] . . . , and then participate[s] in a scheme where that [service is] misrepresented," a

4    defendant does not "use" a victim's identity for the purposes of the aggravated identity theft

5    statute.  *See Hong*, 938 F.3d at 1050.   Specifically, the Ninth Circuit relied on a line of Sixth

6    Circuit cases to explain that when a defendant only misrepresents "how and why" a victim

7    received an actual service, the victim's identity does not further or facilitate fraud.  *See id.*

8    ("Critically, the defendants 'did not attempt to pass themselves off as anyone other than

9    themselves.  [They] misrepresented *how and why* the beneficiaries were transported, but they did

10   not use those beneficiaries' identities to do so.'" (quoting *United States v. Medlock*, 792 F.3d 700,

11   707 (6th Cir. 2015) (emphasis and alteration in original)).

12        In both *Hong* and *Gagarin*, the Ninth Circuit approvingly cited an example provided by the

13   Sixth Circuit that illustrates this point.  According to the Ninth Circuit, if a pharmacist commits

14   fraud only by inflating the *amount of drugs* prescribed to an actual victim, the pharmacist does not

15   "use" a victim's identity under the aggravated identity theft statute.  *See Gagarin*, 950 F.3d at 603

16   n.1 (citing example from *Michael*); *Hong*, 938 F.3d at 1050 (same).  By contrast, if a pharmacist

17   uses a victim's identity to fashion "'a fraudulent submission out of whole cloth,'" the pharmacist

18   *does* use the victim's identity under the aggravated identity theft statute.  *See Gagarin*, 950 F.3d at

19   603 n.1 (citing example from *Michael*); *Hong*, 938 F.3d at 1050 (same).

20        The distinction explains the results reached by the Ninth Circuit, as well as the cases relied

21   upon by the Ninth Circuit.  In *Hong*, the defendant "provided massage services to patients to treat

22   their pain, and then participated in a scheme where that treatment was misrepresented as a

23   Medicare-eligible physical therapy service."  938 F.3d at 1051.  In other words, the defendant only

24   misrepresented the "how and why" of the services that the defendant did in fact provide to

25   patients.  *See United States v. Berroa*, 856 F.3d 141, 156 (1st Cir. 2017) (holding that defendants'

26   use of fraudulent medical licenses to "issue[] prescriptions that their patients would then fill at

27

28   Case No. 16-CR-00334-LHK
     ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
     FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

various pharmacies in Puerto Rico" does not amount to "use" of patients' identities); *United States v. Medlock*, 792 F.3d 700, 708 (6th Cir. 2015) (holding that defendants' "misrepresentation that certain beneficiaries were transported by stretchers does not constitute a 'use' of those beneficiaries' identification under the federal aggravated-identity-theft statute, 18 U.S.C. § 1028A, because their company really did transport" the beneficiaries).

By contrast, in *Gagarin*, the defendant fraudulently used a victim's identity to sign an insurance application in the victim's name. The victim "never saw, let alone signed, the particular application that was submitted" by the defendant. *Gagarin*, 950 F.3d at 603. In *Gagarin*, the defendant thus did far more than merely misrepresent the "how and why" of services the defendant provided to a victim. Instead, the *use of the victim's identity* was itself "central to the fraud and 'furthered and facilitated' its commission." *Id.* at 604; *see also Michael*, 882 F.3d at 629 (finding aggravated identity theft when a defendant used victims' "identifying information to fashion a fraudulent submission out of whole cloth, making the misuse of these means of identification 'during and in relation to'—indeed integral to—the predicate act of healthcare fraud").

Bearing in mind this distinction, and the guidance provided by the Ninth Circuit in *Hong* and *Gagarin*, the Court now surveys Defendants Yang and Wu's statements about Gonzalez in Shengliang Yang's I-829 petition.

### 2. Application of the "Uses" Element to the Instant Case

As discussed, the verdict form specifies that the jury found Defendants Yang and Wu guilty of aggravated identity theft through "the use of William Gonzalez's identity in the I-829 Petition and Supporting Documents for Investor Shengliang Yang during and in relation to committing mail fraud." ECF No. 305 at 4 (emphasis added). Gonzalez's identity appears in multiple places in Shengliang Yang's I-829 petition. Indeed, the government argues that Defendants Yang and Wu "used" Gonzalez's identity for multiple purposes. First, the government points to numerous employment-related misrepresentations that Defendants Yang and Wu made.

Specifically, the government argues that Defendants Yang and Wu falsely represented Gonzalez's status as that of an employee of 1-855-Lawyers, and that Defendants Yang and Wu also misrepresented Gonzalez's role as an employee in various ways.  Second, and relatedly, the government argues that Defendants Yang and Wu falsely represented that Gonzalez received stock in 1-855-Lawyers.  According to the government, through these various misrepresentations, Defendants Yang and Wu "'purported to take . . . action on [Gonzalez's] behalf through impersonation or forgery.'"  Count Seven Opp'n at 9 (quoting *Hong*, 938 F.3d at 1051 n.8).  The Court addresses each category of misrepresentation in turn.

### a.   Employment-Related Misrepresentations

Throughout numerous documents contained within Shengliang Yang's I-829 petition, Defendants Yang and Wu crafted an elaborate fiction about Gonzalez's purported role at 1-855-Lawyers.  In addition to the false representation that Gonzalez was an employee of 1-855-Lawyers, Defendants Yang and Wu produced false dates of employment, false supervisees of Gonzalez, a false supervisor for Gonzalez, and false compensation amounts.  The Court discusses these employment-related misrepresentations before addressing whether the misrepresentations comprise "uses" of Gonzalez's identity under the aggravated identity theft statute.

First, across numerous documents in Shengliang Yang's I-829 petition, Defendants Yang and Wu misrepresented the fact that Gonzalez worked for 1-855-Lawyers.  For instance, Shengliang Yang's I-829 petition contained an I-9 Form, proof of eligibility to be employed in the United States, in which Defendant Wu declared under penalty of perjury that Gonzalez worked at 1-855-Lawyers.  Trial Ex. 71 at 1129.  However, at trial Gonzalez testified that he understood that he worked for Faayou and/or A Legal Forms from August 29, 2011 to September 28 or 29, 2011.  ECF No. 354 at 737:6–739:23 ("I remember the names [of the company that employed Gonzalez] were either Faayou.com or A Legal Forms."); *id.* at 743:22–23 (explaining that Gonzalez's start date was August 29, 2011); *id.* at 758:12–16 (explaining that Gonzalez's end date was "either September 28th or 29th").  Gonzalez had not heard of, and had never agreed to work for 1-855-

United States District Court
Northern District of California

Lawyers. *Id.* at 744:15-17; 745:14–16 (testifying that Gonzalez never "agree[d] to work for a company specifically called 1855Lawyers"). Gonzalez also understood that he would work for Faayou and/or A Legal Forms, when he signed his I-9 Form on August 7, 2011. *Id.* at 742:11–746:7 (explaining that "the only specific instruction" Gonzalez received concerning the job was that Gonzalez would "be given telephone numbers of attorneys and to make cold calls to try to recruit them into the program of Faayou.com or A Legal Forms"). When Gonzalez signed the I-9 Form, the employer's portion of the form was blank. ECF No. 354 at 744:8–14 ("My understanding is that I submitted [the I-9 Form] with the top portion filled out and that the rest would be completed by the employer."); ECF No. 355 at 840:16–841:7 ("Q. When you signed that [I-9] Form, was the employer information filled in at the bottom? A. No."). Gonzalez never saw his I-9 Form with the employer portion filled out with the 1-855-Lawyers information until the prosecution of Defendants Yang and Wu. *Id.* (testifying that Gonzalez did not see the "I-9 Form with the [1]855Lawyers information filled in at the bottom" until the prosecution of Defendants Yang and Wu). After starting his job, Gonzalez received instructions regarding Faayou and A Legal Forms. ECF No. 354 at 746:1–7 (testifying that after starting work, Gonzalez received specific instructions regarding Faayou.com and A Legal Forms).

Moreover, Defendant Yang introduced at trial Gonzalez's August 30 and 31, 2011 emails to Defendants Yang and/or Wu in which Gonzalez identified himself as "Regional Sales Manager, Faayou.com." *Id.* at 825:10–827:4 ("Q. Okay. And I'd like to focus you to the bottom of that e-mail. Can you tell the jury what that says? A. 'Regional Sales Manager, Faayou.com.'"). Defendants Yang and Wu never corrected Gonzalez that Gonzalez's employer was actually 1-855-Lawyers. *Id.* at 844:15–18 ("Q. The question was, in response to those e-mails, did Ms. Yang or Mr. Wu ever correct you and say, 'No, actually, your employer is 1855Lawyers?' A. No.").

Second, Defendants Yang and Wu misrepresented the dates of Gonzalez's employment. Gonzalez testified that Gonzalez's employment with Defendants Yang and Wu did not begin until August 29, 2011. ECF No. 354 at 753:22–23 ("Q. Okay. What was your start date with the

Case No. 16-CR-00334-LHK
ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

company?  A. August 29th, 2011.").   Defendants Yang and Wu represented that Gonzalez began employment before this date, however.  Shengliang Yang's I-829 petition contained three copies of an organizational chart that identified Gonzalez as an employee of 1-855-Lawyers "[a]s on 07/31/2011."  Trial Ex. 71 at 1371, 1511, 1535 (listing Gonzalez as employee of 1-855-Lawyers "[a]s on 07/31/2011").  Moreover, on Gonzalez's I-9 Form, Defendant Wu swore under penalty of perjury that Gonzalez began employment with Defendants Yang and Wu on August 8, 2011.  *Id.* at 1129.  Gonzalez also testified that Gonzalez's employment with Defendants Yang and Wu terminated on either September 28 or 29, 2011.  ECF No. 354 at 758:12–16 (explaining that Gonzalez's end date was "either September 28th or 29th").  However, Defendants Yang and Wu represented that Gonzalez received 2,000 shares in 1-855-Lawyers on December 31, 2011, more than three months after the date that Gonzalez's employment terminated.  Trial Ex. 71 at 1502, 1507.

Third, Defendants Yang and Wu misrepresented the fact that Gonzalez supervised other employees.  Indeed, the organizational charts contained within Shengliang Yang's I-829 petition listed Gonzalez as "Regional Manager" and identified numerous employees who purportedly worked for Gonzalez as direct reports.  Trial Ex. 71 at 1371, 1511, 1535 (listing five employees below Gonzalez as direct reports).  One of these employees, Donghui Luo, was listed as a "Vice Regional Manager" who worked directly below Gonzalez.  *Id.*  Gonzalez testified that Gonzalez did not know Donghui Luo, nor did Gonzalez know that Gonzalez was supposed to supervise a "Vice Regional Manager" during his employment.  ECF No. 354 at 760:7–10 ("Well, for example, I had no idea that I would be, or was, supervising a Vice Regional Manager or that there was a sales team underneath that I would—was managing.  This is all new to me.  I had no idea of that.").  In fact, Gonzalez did not supervise anyone while he worked for Defendants Yang and Wu.  *Id.* at 760:11–15 ("Q. Okay.  Well, let me—let me ask you, were you supervising anyone during your time at the company?  A. No, sir.  Q. A single person?  A. No, sir.").  Gonzalez explained that Gonzalez did not recognize any of the names on the organizational charts, including his own

18

1   purported supervisees.  *Id.* at 762:1–2 ("I don't recognize any names on this page other than mine

2   and Daniel Wu's.").

3        Jack Tien also was listed as a supervisee of Gonzalez in the organizational charts.  Trial

4   Ex. 71 at 1371, 1511, 1535 (listing Jack Tien as employee of 1-855-Lawyers below Gonzalez).

5   However, Tien testified that Tien was not in fact supervised by Gonzalez.  ECF No. 355 at 887:3–

6   6 ("Q. So if this chart indicates that in August 2011 you were a member of a sales team at the

7   company being supervised by William Gonzalez, is that information true or false?  A. That would

8   be false.").  Indeed, Tien explained that Tien never met or had any contact with Gonzalez.  *Id.* at

9   886:25–887:2 ("Q. Okay.  During your time at the company, did you ever have any contact at all

10  with somebody named William Gonzalez?  A. Never.").

11       Similarly, Belen Barragan was listed as an office clerk for 1-855-Lawyers in the

12  organizational charts and a payroll document.  Ex. 71 at 1057, 1371, 1511, 1535.  However,

13  Barragan testified that Barragan did not know Gonzalez and had never worked with him.  ECF

14  354 at 554:23–555:2 ("Q. Okay.  Thank you.  And, again, as to the other names on this list, the

15  name William Gonzalez, does that name mean anything to you?  A. No.   Q. Did you ever work

16  with him?  A. No.").  Indeed, Barragan testified that she worked as a housekeeper for Defendants

17  Yang and Wu and had never heard of a company called 1-855-Lawyers.  *Id.* at 547:18–25 ("Q.

18  Okay.  Before you started the job, did you understand anything about what the business

19  1855Lawyers was?  A. No.  Q. Had you heard of the business 1855Lawyers?  A. No, never.  Q.

20  Before you started working, did anyone mention the name 1855Lawyers to you?  A. No.").

21       Further, similar to Gonzalez, Patrick Stafford was listed as a "Regional Manager" of 1-

22  855-Lawyers in an organizational chart contained within a different EB-5 petitioner's I-829

23  petition.  Trial Ex. 67 at 751.  However, Stafford testified that he never knew Gonzalez, never took

24  over for Gonzalez, and never received training from Gonzalez.  ECF No. 356 at 1158:9–16 ("Do

25  you see the name William Gonzalez, Regional Manager [in the organizational chart]?  A. Yes.  Q.

26  Did you ever know him?  A. No.  Q. Did you ever assume his duties?  A. No.  Q. Did he ever train

27

28

Case No. 16-CR-00334-LHK
ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

United States District Court
Northern District of California

1    you?  A. No.").

2        Fourth, Defendants Yang and Wu misrepresented the fact that Gonzalez was supervised by

3    an employee named Eugene Jun Xiao.  Specifically, on a payroll document included in Shengliang

4    Yang's I-829 petition, Defendants Yang and Wu listed Eugene Jun Xiao as the "Sales Vice

5    President," to whom Gonzalez purportedly reported.  Trial Ex. 71 at 1057.  However, at trial,

6    Gonzalez explained that Gonzalez did not report to Eugene Jun Xiao.  ECF No. 354 at 766:4–5

7    ("Q. [] Did you report to anyone named Eugene Jun Xiao?  A. No, sir.").  Instead, Gonzalez

8    reported only to Defendants Yang and Wu.  *Id.* at 766:6–13 (explaining that Gonzalez "treated

9    both of them [*i.e.*, Defendants Yang and Wu] as my supervisors").

10       Fifth, Defendants Yang and Wu included in Shengliang Yang's I-829 petition several

11   documents that overstated Gonzalez's income.  For instance, Defendants Yang and Wu included

12   two copies of a document entitled "1-855-Lawyers Inc. Employees Stock Transfer Ledger in Dec.

13   2011" in Shengliang Yang's I-829 petition.  Trial Ex. 71 at 1502, 1507.  The stock ledger falsely

14   indicated that Gonzalez paid $2,000 to receive 2,000 shares of 1-855-Lawyers worth a dollar each.

15   *Id.*  Gonzalez testified that he never requested stock from, or discussed the possibility of receiving

16   stock with, Defendants Yang and Wu.  ECF No. 355 at 799:1–8 ("Q. Did you ever discuss the

17   possibility of receiving stock with either Ms. Yang or Mr. Wu?  A. No.  Q. Did you ever ask for

18   stock in the company [1-855-Lawyers]?  A. No.").  The shares were declared to the Internal

19   Revenue Service as income, which resulted in a tax liability for Gonzalez.  *Id.* at 796:10–20

20   (explaining that Gonzalez incurred tax liability as a result of Gonzalez's stock ownership).

21   Indeed, Gonzalez received a Form 1099 from 1-855-Lawyers that showed miscellaneous income

22   of $2,000 in the form of "nonemployee compensation" that was never paid to him.  Trial Ex. 14A

23   at 1 (Form 1099 listing miscellaneous compensation of $2,000 to Gonzalez).

24       Gonzalez then reached out to Defendants Yang and Wu for a correction, but neither

25   corrected the issue.  ECF No. 354 at 766:14–771:4 ("Q. And did Ms. Yang or Mr. Wu ever correct

26   the issue for you?  A. No, sir.").  Gonzalez was concerned that because he had not received the

27

28
     Case No. 16-CR-00334-LHK
     ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
     FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

1    $2,000 income or reported it in his tax return, the Form 1099 would result in more tax liability and

2    provoke a tax audit.  *Id.* at 770:16–22 (explaining that Gonzalez was worried that the Form 1099

3    would result in Gonzalez "paying more taxes than I should be paying" or would risk "provoking

4    an audit").

5         Gonzalez received advice from the Internal Revenue Service and H&R Block, both of

6    which instructed Gonzalez to either submit a letter from his employer stating that the Form 1099

7    was a mistake or to pay the tax.  ECF No. 355 at 796:6–9 ("I got advice from the IRS and H&R

8    Block, and I was told that in order to resolve it, I had to, well, either submit a letter from my

9    employer stating that it was a mistake; or, you know, pay the tax.").  Gonzalez tried to secure such

10   a letter from Defendants Yang and Wu, but was unable to do so.  *Id.* at 769:10–20 ("I tried very

11   hard to get that letter and didn't . . . .").  As a result, Gonzalez amended his tax return to include

12   the Form 1099 income and paid an additional tax.  *Id.* ("I paid additional tax.  That's all I could do

13   not having the letter.").

14        The foregoing misrepresentations served a clear purpose for Defendants Yang and Wu.  In

15   order to qualify for the EB-5 program, an investor must demonstrate that his investment has

16   created ten or more jobs before USCIS will grant the investor full LPR status.  SI ¶ 11.  Indeed,

17   "the core component of the [EB-5 process] is job creation."  ECF No. 363 at 2367:10.  The ten

18   jobs created by an investor must be permanent and full-time; seasonal and temporary employment

19   does not qualify.  *Id.* at 2367:13–14; Count Seven Opp'n at 2.  The government's expert explained

20   that EB-5 petitioners generally only have two years, or at most three years, to create the required

21   ten jobs.  ECF No. 353 at 433:10–22 (explaining that there are "two years from 528 to 829 for job

22   creation," but that USCIS also "allow[s petitioners] an extra year").

23        Further, in order for a job to count toward the requirement, the relevant position generally

24   must be filled.  *Id.* at 433:23–24 ("Generally speaking, open positions on paper are not going to

25   qualify.").  If fewer than ten positions alleged to satisfy the job creation requirement are filled,

26   USCIS will request additional information from the EB-5 petitioner, in order to determine whether

27

28   Case No. 16-CR-00334-LHK
     ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
     FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

21

United States District Court
Northern District of California

1    ten jobs were actually created.  *Id.* at 436:10–18 (explaining that if fewer than ten positions are

2    filled at a new commercial enterprise at the time of an I-829 petition, that "would cause us to send

3    a request for additional evidence to obtain an explanation, as well as any evidence to establish that

4    ten full-time positions have actually been created").  Moreover, if one of the positions that is

5    offered to USCIS to satisfy the job creation requirement has been vacant for a long period, USCIS

6    will likely question whether the position is in fact necessary.  *Id.* at 436:6–9 ("But if I see

7    positions that are open for long periods of time and people are kind of moving around, that

8    absolutely leads me to question whether there is a need for full-time positions in that [new

9    commercial enterprise].").

10        Thus, Defendants Yang and Wu misrepresented Gonzalez's employment in order to

11   successfully provide USCIS with "[e]vidence of 10 full-time qualifying employees created" in

12   order to satisfy the EB-5 requirements.  Trial Ex. 71 at 625 (listing organizational charts, payroll

13   records, and Forms I-9 as "[e]vidence of 10 full-time qualifying employees created"); *id.* at 1277

14   (listing organizational charts, payroll records, Forms I-9, and tax return as evidence that "clearly

15   show[s] that 10 full-time permanent jobs have been created by the petitioner's investment").

16        These misrepresentations, according to the government, amounted to an action that

17   Defendants Yang and Wu purported to take on behalf of Gonzalez.  Specifically, the government

18   asserts that Defendants Yang and Wu "essentially accepted employment on behalf of Gonzalez[]"

19   and thereby "made Gonzalez an employee of a company he never joined (1-855-Lawyers)."

20   Count Seven Opp'n at 9, 13.  The Court disagrees.

21        As an initial matter, the record clearly demonstrates that Defendants Yang and Wu did in

22   fact employ Gonzalez.  *See, e.g.*, ECF No. 354 at 735:18–20 ("Q. Was there a time when you

23   worked for a business owned by either Jennifer Yang or Daniel Wu?  A. Yes.").  Hence, the

24   misrepresentations outlined above concern the identity of the company that employed Gonzalez

25   (*i.e.*, 1-855-Lawyers, as opposed to Faayou and/or A Legal Forms), the timing of Gonzalez's

26   employment, Gonzalez's role at that company, and Gonzalez's compensation.  In other words, the

27

28
     Case No. 16-CR-00334-LHK
     ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
     FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

foregoing misrepresentations concern the "how and why" of Gonzalez's actual employment with Defendants Yang and Wu.

These misrepresentations thus track the examples provided by the Ninth Circuit of conduct that does *not* amount to a "use" of an identity under the aggravated identity theft statute. For instance, as discussed, in *Hong*, the defendant "provided massage services to patients to treat their pain, and then participated in a scheme where that treatment was misrepresented as a Medicare-eligible physical therapy service." 938 F.3d at 1051. The Ninth Circuit nonetheless held that the defendant "did not 'use' the patients' identities within the meaning of the aggravated identity theft statute." *Id.* Similarly, in both *Hong* and *Gagarin*, the Ninth Circuit indicated that if a pharmacist commits fraud by inflating the *amount of drugs* prescribed to a victim, the pharmacist does not "use" a victim's identity under the aggravated identity theft statute. *See Gagarin*, 950 F.3d at 603 n.1 (citing example from *Michael*); *Hong*, 938 F.3d at 1050 (same). The principle that misrepresentations as to the "how and why" of a service provided to a victim does not amount to a "use" of a victim's identity is also articulated by the cases cited by the Ninth Circuit. *See Berroa*, 856 F.3d at 156 (holding that defendants' use of fraudulent medical licenses to "issue[] prescriptions that their patients would then fill at various pharmacies in Puerto Rico" does not amount to "use" of patients' identities); *Medlock*, 792 F.3d at 708 (holding that defendants' "misrepresentation that certain beneficiaries were transported by stretchers does not constitute a 'use' of those beneficiaries' identification under the federal aggravated-identity-theft statute, 18 U.S.C. § 1028A, because their company really did transport" the beneficiaries).

Pursuant to these examples, Defendants Yang and Wu's employment-related misrepresentations cannot amount to a "use" of Gonzalez's identity under the aggravated identity theft statute. Like a doctor who misrepresents the nature of treatments that are in fact provided to patients, and like a pharmacist who inflates the amount of drugs that are in fact provided to patients, Defendants Yang and Wu misrepresented the nature of the employment that Defendants Yang and Wu in fact provided to Gonzalez. Put another way, similar to *Hong*, Defendants Yang

23

United States District Court
Northern District of California

and Wu "provided [employment to Gonzalez], and then participated in a scheme where that [employment] was misrepresented as [sufficient to satisfy EB-5 requirements]." *Id.* at 1051. Under Ninth Circuit case law, Defendants Yang and Wu's employment-related misrepresentations therefore cannot satisfy the requirements of the aggravated identity theft statute.

The government's theory that Defendants Yang and Wu "essentially accepted employment on behalf of Gonzalez[]" and thereby "made Gonzalez an employee of a company he never joined (1-855-Lawyers)" suffers from several further defects. Count Seven Opp'n at 9, 13. First, in *Gagarin*, the Ninth Circuit provided the sole example of a situation in which the Ninth Circuit has thus far held that a defendant "purported to take action on [a victim's] behalf." 950 F.3d at 603. In *Gagarin*, the defendant signed an insurance application in a third party's name, and thereby falsely created the impression that the third party had certified the application. *Id.* The Ninth Circuit explained that *when the defendant signed the insurance application in the third party's name*, the defendant "purported to take action on [her] behalf." *Id.* Unlike the defendant in *Gagarin*, Defendants Yang and Wu did not sign any documents in Gonzalez's name.

Second, the government's theory of aggravated identity theft is in tension with the underlying mail fraud itself. If the government is correct as to its argument that Defendants Yang and Wu "made Gonzalez an employee of a company he never joined (1-855-Lawyers)" and thereby "essentially accepted employment on behalf of Gonzalez[]," Count Seven Mot. at 9, 13, then it is unclear how representations that Gonzalez was employed by 1-855-Lawyers are false in the first place. In the absence of mail fraud, however, there can be no aggravated identity theft. *See* ECF No. 305 at 4 (convicting Defendants Yang and Wu of aggravated identity theft through "the use of William Gonzalez's identity in the I-829 Petition and Supporting Documents for Investor Shengliang Yang *during and in relation to committing mail fraud*" (emphasis added)). In light of the foregoing, the Court concludes that Defendants Yang and Wu's employment-related misrepresentations do not amount to a "use" of Gonzalez's identity under the aggravated identity theft statute. The Court now turns to Defendants Yang and Wu's stock-related misrepresentations

24

about Gonzalez in Shengliang Yang's I-829 petition.

**b.  Stock-Related Misrepresentations**

As stated above, Defendants Yang and Wu misrepresented that Gonzalez received stock in 1-855-Lawyers.  The Court discusses these stock-related misrepresentations before addressing whether the misrepresentations comprise "uses" of Gonzalez's identity under the aggravated identity theft statute.

Defendants Yang and Wu included two copies of a document entitled "1-855-Lawyers Inc. Employees Stock Transfer Ledger in Dec. 2011" ("stock ledger") in Shengliang Yang's I-829 petition.  Trial Ex. 71 at 1502, 1507.  The stock ledger falsely indicated that Gonzalez paid $2,000 to receive 2,000 shares of 1-855-Lawyers worth a dollar each.  *Id.*  Gonzalez testified that he never requested stock from, or discussed the possibility of receiving stock with, Defendants Yang and Wu.  ECF No. 355 at 799:1–8 ("Q. Did you ever discuss the possibility of receiving stock with either Ms. Yang or Mr. Wu?  A. No.  Q. Did you ever ask for stock in the company [1-855-Lawyers]?  A. No.").  Gonzalez never knew the company even issued stock.  *Id.* ("Q. Did you even know that the company—or did you know whether the company [1-855-Lawyers] issued stock?  A. No, I didn't.  I have no idea.").

Gonzalez never received 2,000 shares of 1-855-Lawyers stock, never paid for the stock, and was never given a stock certificate or any record reflecting ownership of the shares.  *Id.* at 801:9–22 (explaining that Gonzalez did not "receive 2,000 shares of stock in the company 1855Lawyers," Gonzalez did not "ever pay $2,000 for shares in the company 1855Lawyers," and Gonzalez was never "given a stock certificate or any other record reflecting [Gonzalez's] ownership of shares in the company").

The stock ledger was dated December 2011, months after Gonzalez left employment with Defendants Yang and Wu in September 2011, and stated that the shares were issued on August 1, 2011, even though Defendant Wu swore under penalty of perjury on Gonzalez's I-9 Form that Gonzalez began employment with Defendants Yang and Wu on August 8, 2011.  Trial Ex. 71 at

United States District Court
Northern District of California

1129.  The alleged August 1, 2011 stock issuance date is also before Gonzalez signed the I-9 Form

on August 7, 2011 and before Gonzalez began working with Defendants Yang and Wu on August

29, 2011.  *Id.* at 799:19–801:2 (explaining that "in December of 2011," Gonzalez was not "still

working for [1]855Lawyers," and noting that "under date shares issued, the date [on the stock

ledger] is August 1st 2011").  The stock ledger used Gonzalez's name and 2011 home address.  *Id.*

at 800:13–24 ("Q. Okay.  What is the name listed under the first column there?  A. My name,

William Gonzalez.  Q. Okay.  And do you see the address information next to it?  A. Yes.").

The shares were separately declared to the Internal Revenue Service as income, which

resulted in a tax liability for Gonzalez.  *Id.* at 796:10–20 (explaining that Gonzalez incurred tax

liability as a result of Gonzalez's stock ownership).  Gonzalez received a Form 1099 from 1-855-

Lawyers that showed miscellaneous income of $2,000 in the form of "nonemployee

compensation" that was never paid to him.  Trial Ex. 14A at 1 (Form 1099 listing miscellaneous

compensation of $2,000 to Gonzalez).  Gonzalez then reached out to Defendants Yang and Wu for

a correction, but neither corrected the issue.  ECF No. 354 at 766:14–771:4 ("Q. And did Ms.

Yang or Mr. Wu ever correct the issue for you?  A. No, sir.").  Gonzalez was concerned that

because he had not received the $2,000 income or reported it in his tax return, the Form 1099

would result in more tax liability and provoke a tax audit.  *Id.* at 770:16–22 (explaining that

Gonzalez was worried that the Form 1099 would result in Gonzalez "paying more taxes than I

should be paying" or would risk "provoking an audit").

Gonzalez received advice from the Internal Revenue Service and H&R Block, both of

which instructed Gonzalez to either submit a letter from his employer stating that the Form 1099

was a mistake or to pay the tax.  ECF No. 355 at 796:6–9 ("I got advice from the IRS and H&R

Block, and I was told that in order to resolve it, I had to, well, either submit a letter from my

employer stating that it was a mistake; or, you know, pay the tax.").  Gonzalez tried to secure such

a letter from Defendants Yang and Wu, but was unable to do so.  *Id.* at 769:10–20 ("I tried very

hard to get that letter and didn't . . . .").  As a result, Gonzalez amended his tax return to include

Case No. 16-CR-00334-LHK
ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

1  the Form 1099 income and paid an additional tax.  *Id.* ("I paid additional tax.  That's all I could do

2  not having the letter.").

3       Defendants Yang and Wu made stock-related misrepresentations as to Gonzalez and other

4  employees in order "to artificially inflate what appeared to be the pay of these employees so that

5  [Defendants Yang and Wu] could make it seem like the employees were working there for longer

6  than they actually were."  ECF No. 363 at 2535:2–5.  As with Defendants Yang and Wu's

7  employment-related misrepresentations, the purpose of the stock-related misrepresentations was

8  therefore ultimately to deceive USCIS as to whether Shengliang Yang's I-829 petition satisfied the

9  job creation requirements of the EB-5 program.  *Id.*

10      As with the employment-related misrepresentations, the government contends that these

11  stock-related misrepresentations amounted to an action that Defendants Yang and Wu purported to

12  take on behalf of Gonzalez.  Indeed, according to the government, Defendants Yang and Wu

13  effectively "accepted shares on [Gonzalez's] behalf" when Defendants Yang and Wu made the

14  relevant misrepresentations.  Again, the Court disagrees.

15      As an initial matter, the Court notes that the aggravated identity theft count in the instant

16  case is seemingly limited in scope.  Count Seven of the Superseding Indictment charges

17  Defendants Yang and Wu with the commission of aggravated identity theft within the "I-829

18  Petition and Supporting Documents for Investor S.Y.," during and in relation to mail fraud.  SI ¶¶

19  39–40.  Similarly, the jury found Defendants Yang and Wu guilty "of Aggravated Identity Theft,

20  in violation of Title 18, United States Code, Section 1028A, *as to the use of William Gonzalez's*

21  *identity in the I-829 Petition and Supporting Documents for Investor Shengliang Yang*."  ECF No.

22  344 at 4 (emphasis added).

23      The government nonetheless heavily relies on the fact that "[t]he shares were *declared to*

24  *the IRS as income*, creating a tax liability for Gonzalez."  Count Seven Opp'n at 11 (emphasis

25  added).  The government asserts that "*by reporting the share value, $2,000, as income received by*

26  *Gonzales to the IRS*, [Defendants Yang and Wu] essentially 'accepted' the issuance of shares on

27

28

Case No. 16-CR-00334-LHK
ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

Gonzalez' behalf." *Id.* at 12 (emphasis added).  As discussed, the government's expert testified that an I-829 petition is not a "static document that's frozen in time on the date of its submission." ECF No. 353 at 428:4–12.  Thus, "from the time of filing through final adjudication, [USCIS] accept[s] any additional evidence filed by the petitioner," which is incorporated into the I-829 petition.  *Id.*  Here, the Form 1099 that describes Gonzalez's purported 1-855-Lawyer stock receipt was not contained within the I-829 petition for Shengliang Yang, in light of the foregoing expert testimony, the scope of the I-829 petition's "supporting documents" is unclear.  *See, e.g.*, ECF No. 353 at 348:4–6 (arguing that Defendants Yang and Wu committed visa fraud "because they signed false visa petitions or supporting documents *in those petitions* under penalty of perjury" (emphasis added)).  The Court assumes for the purposes of the instant motion that the government may rely on the Form 1099 to establish Defendants Yang and Wu's "use of William Gonzalez's identity in the I-829 Petition and Supporting Documents for Investor Shengliang Yang," notwithstanding the fact that the Form 1099 was not submitted to USCIS.  ECF No. 344 at 4.

Accordingly, the Court must determine whether the two copies of the stock ledger contained within the I-829 petition for Shengliang Yang, as well as the Form 1099 Gonzalez received in connection with the false stock issuance, amounts to a "use" of Gonzalez's identity for the purposes of the aggravated identity theft statute.  Trial Ex. 12 at 1; Trial Ex. 71 at 1502, 1507.

The misrepresentations contained within the stock ledger and Form 1099 present a thornier issue than the employment-related misrepresentations.  Indeed, it is difficult to discern precisely how these misrepresentations fit into the Ninth Circuit's guidance as to the "uses" element of aggravated identity theft.  Gonzalez never paid for, never received, and never owned any stock in 1-855-Lawyers at all.  To the extent that Defendants Yang and Wu misrepresented that Gonzalez purchased, received, and owned stock when Gonzalez did not in fact own any, Defendants Yang and Wu's actions appear to differ from those of a pharmacist who only inflates the amount of drugs in fact prescribed to a patient.  *See Gagarin*, 950 F.3d at 603 n.1 (citing example from

28

*Michael*); *Hong*, 938 F.3d at 1050 (same).  Defendants Yang and Wu's creation of the stock ledger was "'a fraudulent submission [crafted] out of whole cloth,'" which would qualify as a "use" of a victim's identity.  *Gagarin*, 950 F.3d at 603 n.1 (citing example from *Michael*).

Additionally, the Ninth Circuit and numerous other courts have noted that "the use of another person's means of identification makes a fraudulent claim . . . much harder to detect and, therefore, more likely to succeed."  *United States v. Abdelshafi*, 592 F.3d 602, 610 (4th Cir. 2010); *see also Gagarin*, 950 F.3d at 604 (citing *Abdelshafi*).  Here, Defendants Yang and Wu used multiple means of identification associated with Gonzalez: Gonzalez's name and actual home address appeared on both the stock ledger and Form 1099.  Gonzalez's social security number also appeared on the Form 1099.  The use of Gonzalez's means of identification no doubt made it more difficult for the authorities to detect Defendants Yang and Wu's fraudulent scheme than if Defendants Yang and Wu had created fictional individuals to receive the alleged stock.

On the other hand, the record is also clear that Defendants Yang and Wu did in fact employ Gonzalez, and that Defendants Yang and Wu also did in fact compensate Gonzalez for that employment.  To the extent that the stock ledger and Form 1099 reported *additional* compensation for Gonzalez, as the government expressly argued at trial, then the actions of Defendants Yang and Wu resemble those of a pharmacist who inflates the amount of drugs prescribed to a patient.  *See* ECF No. 363 at 2535:2–5 (arguing that the purpose of the stock-related misrepresentations was "to artificially inflate what appeared to be the pay of these employees").  Indeed, framed in this manner, Defendants Yang and Wu misrepresented the "how and why" of Gonzalez's compensation during his actual employment with them.  *See Hong*, 938 F.3d at 1050 ("Critically, the defendants 'did not attempt to pass themselves off as anyone other than themselves.  [They] misrepresented *how and why* the beneficiaries were transported, but they did not use those beneficiaries' identities to do so.'" (quoting *United States v. Medlock*, 792 F.3d 700, 707 (6th Cir. 2015) (emphasis and alteration in original)); *see also Berroa*, 856 F.3d at 156 (holding that defendants' use of fraudulent medical licenses to "issue[] prescriptions that their patients would

29

United States District Court
Northern District of California

then fill at various pharmacies in Puerto Rico" does not amount to "use" of patients' identities); *Medlock*, 792 F.3d at 708 (holding that defendants' "misrepresentation that certain beneficiaries were transported by stretchers does not constitute a 'use' of those beneficiaries' identification under the federal aggravated-identity-theft statute, 18 U.S.C. § 1028A, because their company really did transport" the beneficiaries). The Ninth Circuit has held that misrepresentations of this nature do not constitute "uses" of a victim's identity for the purposes of the aggravated identity theft statute. *Hong*, 938 F.3d at 1050.

As discussed, in *Gagarin*, the victim "never saw, let alone signed, the particular application that was submitted" by the defendant. *Gagarin*, 950 F.3d at 603. Here, like the victim in *Gagarin*, Gonzalez never saw, signed or was aware of any stock purchase, receipt, or ownership by him. Gonzalez was not even aware that he worked for 1-855-Lawyers, much less that 1-855-Lawyers issued stock. Thus, it can be argued that the use of Gonzalez's identity was "central to the fraud and 'furthered and facilitated' its commission." *Id.* at 604; *see also Michael*, 882 F.3d at 629 (finding aggravated identity theft when a defendant used victims' "identifying information to fashion a fraudulent submission out of whole cloth, making the misuse of these means of identification 'during and in relation to'—indeed integral to—the predicate act of healthcare fraud"). However, in *Gagarin*, the defendant signed an insurance application in a third party's name, and thereby falsely created the impression that the third party had certified the application. *Id.* The Ninth Circuit explained that *when the defendant signed the insurance application in the third party's name*, the defendant "purported to take action on [her] behalf." *Id.* Unlike the defendant in *Gagarin*, Defendants Yang and Wu did not sign any documents in Gonzalez's name.

Finally, as the First Circuit has noted, the legislative history of the aggravated identity theft statute suggests that Congress intended the word "uses" to have a narrow scope. The relevant House Report provides examples of aggravated identity theft. "Notably, each of these examples involved the defendant's use of personal information to pass him or herself off as another person, or the transfer of such information to a third party for use in a similar manner." *Berroa*, 856 F.3d

30

United States District Court
Northern District of California

at 156 (citing H.R. Rep. No. 108-528, at 5–6, *reprinted in* 2004 U.S.C.C.A.N. 781–82).  The Ninth Circuit approvingly discussed the First Circuit's analysis of the aggravated identity theft statute's legislative history, and the Ninth Circuit relied in part on this analysis to adopt a narrow construction of the statute.  *See Hong*, 938 F.3d at 1051 (recounting the First Circuit's analysis of the legislative history of the aggravated identity theft statute).  The examples of aggravated identity theft contained within the legislative history of the statute, which "include[] 'bogus Federal income tax returns in others' names' and 'use of stolen identity to apply for and receive Social Security benefits'" do not resemble the representations in the stock ledger and Form 1099 that Gonzalez received stock in 1-855-Lawyers.  *Id.* (quoting *Berroa*, 856 F.3d at 156).

In sum, the applicable authority as to whether Defendants Yang and Wu's stock-related misrepresentations constitute "uses" for the purposes of the aggravated identity theft statute is unclear.  "Confronted with two reasonable interpretations of 'uses' and no conclusive guidance from the legislative history or case law (this is an issue of first impression), we apply the rule of lenity, which 'requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.'"  *United States v. Miller*, 734 F.3d 530, 542 (6th Cir. 2013) (quoting *United States v. Beals*, 698 F.3d 248, 273 (6th Cir. 2012)); *cf. United States v. Spears*, 729 F.3d 753, 757 (7th Cir. 2013) (en banc) (explaining that dispute about aggravated identity theft statute's use of the word "another" "must be resolved by the Rule of Lenity, under which conviction is possible only when a law declares in understandable words what is forbidden").  In light of the absence of authority as to the status of the stock-related misrepresentations, the Court concludes that the aggravated identity theft statute's "use" requirement "is sufficiently ambiguous in this context that the rule of lenity should apply."  *United States v. Millis*, 621 F.3d 914, 918 (9th Cir. 2010).  Accordingly, the Court must resolve the question of the scope of the aggravated identity theft statute against the government.  *Id.* at 916–17.

For this reason, the Court concludes that when Defendants Yang and Wu misrepresented Gonzalez's purchase, receipt, and ownership of 2,000 shares of 1-855-Lawyer stock in the stock

Case No. 16-CR-00334-LHK
ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION
FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

1  ledger and Form 1099, Defendants Yang and Wu did not "use" Gonzalez's identity under the

2  aggravated identity theft statute.  Further, as discussed above, Defendants Yang and Wu did not

3  "use" Gonzalez's identity under the aggravated identity theft statute when Defendants Yang and

4  Wu made the employment-related misrepresentations about Gonzalez in Shengliang Yang's I-829

5  petition.  Thus, no rational jury could have concluded that Defendants Yang or Wu "used"

6  Gonzalez's identity in furtherance of mail fraud under 18 U.S.C. § 1028A in the context of

7  Shengliang Yang's I-829 petition.  Accordingly, the Court GRANTS Defendants Yang and Wu's

8  motion for judgment of acquittal on Count Seven of the Superseding Indictment.

9  **IV.     CONCLUSION**

10        For the foregoing reasons, the Court DENIES Defendants Yang and Wu's motion for

11  judgment of acquittal on Count Two of the Superseding Indictment.  The Court GRANTS

12  Defendants Yang and Wu's motion for judgment of acquittal on Count Seven of the Superseding

13  Indictment.

14  **IT IS SO ORDERED.**

16  Dated:  May 5, 2020

17                                              _____

18                                              LUCY H. KOH
                                                United States District Judge

United States District Court
Northern District of California