UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>JENNIFER YANG and DANIEL WU,<br><br>　　　　Defendants. | Case No. 16-CR-00334-LHK<br><br>**AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN[1]**<br><br>Re: Dkt. Nos. 346, 347, 348 |

Before the Court are Defendants Jennifer Yang and Daniel Wu's motion for judgment of acquittal on count two of the Superseding Indictment, ECF Nos. 346, 348, and Defendants Yang and Wu's motion for judgment of acquittal on count seven of the Superseding Indictment, ECF Nos. 347, 348. Having considered the filings of the parties, the relevant law, and the record in this case, the Court DENIES Defendants Yang and Wu's motion for judgment of acquittal on Count Two of the Superseding Indictment. The Court GRANTS Defendants Yang and Wu's motion for judgment of acquittal on Count Seven of the Superseding Indictment.

## I.        BACKGROUND

---

[1] This order supersedes ECF No. 385, which was vacated.

1

Case No. 16-CR-00334-LHK
AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

**A. The EB-5 Visa Program**

The EB-5 visa program permits foreigners and their immediate family members to obtain a path to Lawful Permanent Residency ("LPR") in the United States by investing $1,000,000 in a commercial enterprise. ECF No. 4, Superseding Indictment ("SI") ¶ 9. The investment need only be $500,000 if it is invested in certain geographic areas with low employment rates. *Id.* After two years in the EB-5 visa program, if the investor's commercial enterprise creates ten or more jobs, United States Citizen and Immigration Services ("USCIS") will lift the restrictions on the investor's temporary residency status and grant the foreigner and her immediate family full LPR status. *Id.* ¶ 11.

One way to participate in the EB-5 visa program is through the creation of New Commercial Enterprises ("NCE"), which is defined as an investment in a new or existing business that generates new jobs in the United States. *Id.* ¶ 12. USCIS permits multiple investors to invest in the same NCE for the purposes of the EB-5 visa program. *Id.* However, the job creation requirement remains the same for each investor. *Id.* Thus, if two individual investors opt to invest in the same NCE, a total of twenty jobs must be created in order to satisfy the EB-5 visa program's job creation requirement. *Id.*

The first step to apply for an EB-5 visa is to submit a form I-526, Immigrant Petition by Alien Investor. *Id.* ¶ 13. The form I-526 requires the name and biographical data of the proposed investor; the name, address, and description of the investor's commercial enterprise; the date and amount of investment; and the investor's job title and duties. *Id.*

The form I-526 also requires supporting documentation, such as evidence that the investor has, among other things, established a lawful business entity and invested, or is actively in the process of investing, the required capital. *Id.* ¶ 14. Additionally, the investor must provide evidence that the enterprise will create at least ten full-time positions, as defined by USCIS. *Id.* Finally, the investor must provide evidence that the investor will be engaged in the management of the commercial enterprise. *Id.* The form I-526 requires the investor to "certify, under penalty of perjury under the laws of the United States of America, that this petition and the evidence

2

United States District Court
Northern District of California

submitted with it is all true and correct." *Id.* ¶ 15.

Upon approval of the I-526 petition, the investor must then file a form I-485, Application for Conditional Permanent Residency Status. *Id.* ¶ 16. The form I-485 confers conditional permanent residency status to the investor, and this conditional permanent residency status lasts for two years. *Id.* Within 90 days of the second anniversary of the date that the investor received conditional permanent residency status, the investor must finally file a form I-829, Petition by Entrepreneur to Remove Conditions. *Id.*

The form I-829 requests that USCIS grant LPR status to the investor. *Id.* Similar to the form I-526, the form I-829 requires the name and biographical data of the investor; the name of the investor's immediate family members that will receive LPR status; the date and amount of the investment; and the number of jobs created by the investor. *Id.*

The form I-829 requires supporting documentation such as evidence that the commercial enterprise exists and was maintained through the period of the investor's conditional permanent residency status. *Id.* ¶ 17. The investor must also provide evidence of the number of the full-time employees of the commercial enterprise when the investment was first made, and the number of full-time employees of the commercial enterprise when the form I-829 was submitted. *Id.* This proof can consist of documents such as I-9s and W-2s. *Id.* The form I-829 is subject to the same penalty of perjury provision as the form I-526. *Id.* ¶ 18.

**B. The Instant Case**

On July 28, 2016, a grand jury in the Northern District of California returned an indictment that charged Defendant Yang with three counts: (1) visa fraud, 18 U.S.C. § 1546, (2) mail fraud, 18 U.S.C. § 1341, and (3) aggravated identity theft, 18 U.S.C. § 1028A. ECF No. 1.

On October 12, 2017, a grand jury in the Northern District of California returned a Superseding Indictment that charged Defendant Yang with ten counts. SI ¶¶ 32–42. Count One alleged a conspiracy to commit visa fraud, mail fraud, aggravated identity theft, and to defraud the United States. *Id.* ¶¶ 32–34. Counts Two, Three, and Four alleged visa fraud, 18 U.S.C. §

3

1546(a).  *Id.* ¶¶ 35–36.  Counts Five and Six alleged mail fraud, 18 U.S.C. § 1341.  *Id.* ¶¶ 37–38.

Counts Seven and Eight alleged aggravated identity theft, 18 U.S.C. § 1028A.  *Id.* ¶¶ 39–40.

Finally, Counts Nine and Ten alleged money laundering, 18 U.S.C. § 1957.  *Id.* ¶¶ 41–42.  The

Superseding Indictment also charged Defendant Wu with each of the foregoing Counts except for

Counts Nine and Ten.  *Id.*  ¶¶ 32–40.

On October 15, 2019, Defendant Yang moved to dismiss Counts Two, Three, Four, Five,

Seven, and Eight of the Superseding Indictment.  ECF Nos. 163, 165.   On November 1, 2019, the

Court denied Defendant Yang's motions to dismiss Counts Two, Three, Four, Five, Seven, and

Eight of the Superseding Indictment.  ECF No. 221.

On October 15, 2019, Defendant Wu moved to dismiss Counts Two, Five, and Seven of

the Superseding Indictment.  ECF No. 173.  On November 7, 2019, the Court denied Defendant

Wu's motion to dismiss Counts Two, Five, and Seven of the Superseding Indictment.  ECF No.

239.

On December 16, 2019, following a twelve-day trial, the jury unanimously returned a split

verdict.  ECF No. 344.  Specifically, the jury unanimously found Defendants Yang and Wu guilty

of Counts One, Two, Four, Five, and Seven of the Superseding Indictment.  *Id.*  The jury also

unanimously found Defendants Yang and Wu not guilty of Counts Three, Six, and Eight of the

Superseding Indictment.  *Id.*  Finally, the jury unanimously found Defendant Yang not guilty of

Counts Nine and Ten of the Superseding Indictment.  *Id.*

On December 27, 2019, Defendant Yang filed the instant motion for judgment of acquittal

on Count Two of the Superseding Indictment.  ECF No. 346 ("Count Two Mot.").  On January 17,

2020, the government opposed.  ECF No. 370 ("Count Two Opp'n").  Defendant Yang did not file

a reply in support of the motion for judgment of acquittal on Count Two of the Superseding

Indictment.

On December 27, 2019, Defendant Yang also filed the instant motion for judgment of

acquittal on Count Seven of the Superseding Indictment.  ECF No. 347 ("Count Seven Mot.").  On

Case No. 16-CR-00334-LHK
AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING
MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

1   January 17, 2020, the government opposed.  ECF No. 369 ("Count Seven Opp'n").  On January

2   24, 2020, Defendant Yang filed a reply in support of the motion.  ECF No. 372 ("Count Seven

3   Reply").

4          On December 30, 2019, Defendant Wu moved to join both Defendant Yang's motion for

5   judgment of acquittal on Count Two of the Superseding Indictment and Defendant Yang's motion

6   for judgment of acquittal on Count Seven of the Superseding Indictment.  ECF No. 348.  The

7   Court GRANTS Defendant Wu's motion to join both of Defendant Yang's motions.

8   ## II.    LEGAL STANDARD

9   ### A.  Motion for Judgment of Acquittal

10          Federal Rule of Criminal Procedure 29 allows a criminal defendant to move for a judgment

11  of acquittal on the grounds of insufficient evidence after the entry of a guilty verdict.  Under Rule

12  29, "the relevant question is whether, after viewing the evidence in the light most favorable to the

13  prosecution, any rational trier of fact could have found the essential elements of the crime beyond

14  a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

15          In deciding a Rule 29 motion, "[t]he district court . . . must bear in mind that it is the jury's

16  exclusive function to determine the credibility of witnesses, resolve evidentiary conflicts, and

17  draw reasonable inferences from proven facts."  *United States v. Bernhardt*, 840 F.2d 1441, 1448

18  (9th Cir. 1988).  Additionally, a district court may find that "circumstantial evidence and

19  inferences drawn from it" are sufficient to sustain a conviction.  *United States v. Reyes-Alvarado*,

20  963 F.2d 1184, 1188 (9th Cir. 1992), *as amended* (June 15, 1992).

21  ## III.   DISCUSSION

22          Defendants Yang and Wu seek judgment of acquittal as to two different counts of the

23  Superseding Indictment.  First, Defendants Yang and Wu move for judgment of acquittal on

24  Count Two of the Superseding Indictment.  Specifically, Defendants Yang and Wu argue that the

25  government committed a fatal variance from the allegations contained within Count Two of the

26  Superseding Indictment.  Second, Defendants Yang and Wu seek judgment of acquittal on Count

27

5

28  Case No. 16-CR-00334-LHK
    AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING
    MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

United States District Court
Northern District of California

Seven of the Superseding Indictment.  Defendants Yang and Wu argue that the government failed to introduce sufficient evidence to enable any rational jury to conclude that Defendants Yang and Wu satisfied the "uses" element of aggravated identity theft beyond a reasonable doubt.  The Court considers each argument in turn.

### A.  Motion for Judgment of Acquittal on Count Two of the Superseding Indictment

The jury unanimously found Defendants Yang and Wu to be guilty of Count Two of the Superseding Indictment, which charges the offense of visa fraud, 18 U.S.C. § 1546(a).  SI ¶¶ 35–36.  The visa fraud statute, 18 U.S.C. § 1546(a), provides in pertinent part: "Whoever knowingly makes under oath, or as permitted under penalty of perjury . . . knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws . . . [is guilty of visa fraud]."  18 U.S.C. § 1546(a).

Count Two of the Superseding Indictment alleges that Defendants Yang and Wu made false statements in connection with the "I-829 Petition and Supporting Documents for Investor S.Y."  *Id.* ¶ 36.  "Investor S.Y." is a Chinese national named Shengliang Yang.  Count Seven Mot. at 2 ("The Superseding Indictment alleges that Ms. Yang made false statements in Shengliang Yang's I-829 petition and supporting documents . . . .");  Count Seven Opp'n at 9 (noting that "the I-829 Petition for Shengliang Yang correspond[s] to Count 2 in the Indictment").

As discussed, Defendants Yang and Wu move for judgment of acquittal on Count Two of the Superseding Indictment.  Defendants Yang and Wu argue that acquittal is warranted as to Count Two because the government committed a fatal variance.  Specifically, Defendants Yang and Wu claim that the Superseding Indictment charges Defendants Yang and Wu with misrepresentations contained "in Shengliang Yang's I-829 petition and supporting documents filed on or about August 15, 2011.  However, the government adduced different misrepresentations at trial by relying upon documents submitted in response to RFEs [*i.e.*, requests for evidence] that were not included with the initial I-829 petition."  Count Two Mot. at 3.  Hence, Defendants Yang and Wu argue that the government committed a variance that warrants acquittal.

Case No. 16-CR-00334-LHK
AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

1    *Id.*

2         In response, the government offers two arguments.  First, the government asserts that

3    Defendants Yang and Wu misread the record and that the government did in fact rely on

4    misrepresentations contained within Shengliang Yang's initial I-829 petition.  Hence, the

5    government contends that there was no variance with respect to Count Two.  Count Two Opp'n at

6    9–10.  Second, the government asserts that to the extent there was indeed a variance, the variance

7    did not prejudice Defendants Yang and Wu's substantial rights.  *Id.* at 10–11.  Defendants Yang

8    and Wu did not file a reply and thus fail to respond to the government's arguments.

9         The Court concludes that there was no variance as to Count Two.  The government

10   presented false statements contained within Shengliang Yang's initial I-829 petition, and these

11   false statements were sufficient to support the guilty verdict against Defendants Yang and Wu as

12   to Count Two of the Superseding Indictment.  Accordingly, the Court need not reach the

13   government's alternative argument that to the extent there was a variance, the variance did not

14   prejudice Defendants Yang and Wu's substantial rights.

15        According to Defendants Yang and Wu, the government committed a variance as to Count

16   Two because "the government sought to bootstrap supplemental documents that were submitted in

17   response to Requests for Evidence" from USCIS.  Count Two Mot. at 2.  Specifically, Defendants

18   Yang and Wu contend that "[t]hese documents include (1) payroll records for August 2011

19   identifying William Gonzalez as Sales Director, (2) Mr. Gonzalez' I-9 form, (3) Mr. Gonzalez' tax

20   returns for employment, (4) three copies of an organizational chart, and (5) an employee stock

21   ledger."  *Id.*

22        However, as the government explains, Defendants Yang and Wu misread the record.  The

23   I-9 Form and organizational chart that Defendants Yang and Wu cite were in fact filed on or about

24   August 15, 2011 as part of Shengliang Yang's initial I-829 petition.  Indeed, the table of contents

25   of the initial I-829 petition lists the 1-855-Lawyers, Inc. ("1-855-Lawyers") organizational chart

26   and associated I-9 Forms as proof of the ten "full-time qualifying employees" allegedly created by

27

28   Case No. 16-CR-00334-LHK
     AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING
     MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

Shengliang Yang's investment.  *See* Trial Ex. 71 at 625 ("Evidence of 10 full-time qualifying

employees created // N. Organization chart for August and July 2011; Payroll records from

04/01/2008 - 07/31/2011 // O. Forms I-9 and ID (passports, permanent resident cards, etc.)").

These documents list William Gonzalez as an employee of 1-855-Lawyers.  *See id.* at 1057 (listing

William Gonzalez as "Sales Director" in 1-855-Lawyers organizational chart); *id.* at 1129

(asserting in I-9 Form that William Gonzalez commenced employment at 1-855-Lawyers on

August 8, 2011).

　　　　At trial, Gonzalez testified that Gonzalez worked for Defendants Yang and Wu for

approximately one month, beginning on August 29, 2011.  ECF No. 354 at 743:22–23 ("Q. Okay.

What was your start date with the company?  A. August 29th, 2011."); *id.* at 756:7–757:22 ("I was

only there for 30 days . . . .").  During that time, Gonzalez understood himself to be an employee

of the companies Faayou or A Legal Forms.  *Id.* at 737:1–8 (testifying that Gonzalez believed the

job to be to recruit attorneys for "either Faayou.com or A Legal Forms.  Specifically, that's what I

understood prior to [the job interview] meeting" with Defendant Yang); *id.* at 739:18–23

(testifying that Gonzalez heard "no mention" of 1-855-Lawyers during the interview process, but

recalling specific memory of A Legal Forms and Faayou.  Gonzalez had not heard of, and had

never agreed to work for 1-855-Lawyers.  *Id.* at 744:15–17 ("Q. And am I remembering correctly

that you said earlier that before starting the job, you had not heard of 1855Lawyers?  A. That's

correct."); 745:14–16 (testifying that Gonzalez never "agree[d] to work for a company specifically

called 1855Lawyers").

　　　　When Gonzalez signed the I-9 Form on August 7, 2011, the employer's portion of the form

was blank.  *Id.* at 744:8–14 ("I don't recognize this part of the form.  My understanding is that I

submitted it with the top portion filled out and that the rest would be completed by the employer.")

Gonzalez never saw his I-9 Form with the employer portion filled out with the 1-855-Lawyers

information until the prosecution of Defendants Yang and Wu.  ECF No. 355 at 840:16–841:7

(testifying that Gonzalez did not see the "I-9 Form with the [1]855Lawyers information filled in at

Case No. 16-CR-00334-LHK
AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING
MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

the bottom" until the prosecution of Defendants Yang and Wu).  After starting his job, Gonzalez received instructions regarding Faayou and A Legal Forms.  ECF No. 354 at 746:1–7 (testifying that after starting work, Gonzalez received specific instructions regarding Faayou.com and A Legal Forms).

Defendant Yang introduced at trial Gonzalez's August 30 and 31, 2011 emails to Defendants Yang and/or Wu in which Gonzalez identified himself as "Regional Sales Manager, Faayou.com."  ECF No. 355 at 825:10–827:4 ("Q. Okay.  And I'd like to focus you to the bottom of that e-mail.  Can you tell the jury what that says?  A. 'Regional Sales Manager, Faayou.com.'").  Defendants Yang and Wu never corrected Gonzalez that Gonzalez's employer was actually 1-855-Lawyers.  *Id.* at 844:15–18 ("Q. The question was, in response to those e-mails, did Ms. Yang or Mr. Wu ever correct you and say, 'No, actually, your employer is 1855Lawyers?'  A.  No.").

Shengliang Yang's initial I-829 petition also included the I-9 Form for Belen Barragan.  Trial Ex. 71 at 1125.  The I-9 Form stated that Belen Barragan was an employee of 1-855-Lawyers beginning on June 25, 2011.  *Id.*  However, at trial, Barragan testified that around that date, in late June 2011, Barragan was in fact hired to work as a housekeeper for Defendants Yang and Wu.  ECF No. 354 at 550:19–22 ("Q. What was your job title when you worked for Jennifer Yang and Daniel Wu?  A. Just housekeeping for them.  I didn't really get a job title.").  Barragan testified that the job consisted of cleaning the homes of Defendants Yang and Wu, delivering groceries for Defendant Yang, and performing meal preparation for Defendant Yang.  *Id.* at 549:15–21 (outlining responsibilities).  Barragan testified that the job was not full-time and lasted no longer than two months.  *Id.* at 544:16–17 ("Q. Okay. But it was not full-time?  A. No."); *id.* at 557:18–20 ("Q. And let me ask, for how long did you work for Ms. Yang and Mr. Wu?  A. No longer than two months.").

Barragan testified that during this period Barragan understood that she worked for individuals and not for a company.  *Id.* at 566:20–22 ("Q. In your mind, did you work for a company or did you work for individuals?  A. I worked for individuals.").  Indeed, Barragan

United States District Court
Northern District of California

1    testified that she had never heard of a company called 1-855-Lawyers before she started working

2    as the housekeeper for Defendants Yang and Wu.  *Id.* at 547:18–25 ("Q. Okay.  Before you started

3    the job, did you understand anything about what the business 1855Lawyers was?  A. No.  Q. Had

4    you heard of the business 1855Lawyers?  A. No, never.  Q. Before you started working, did

5    anyone mention the name 1855Lawyers to you?  A. No.").  Barragan also testified that Barragan

6    never learned what the company 1-855-Lawyers did.  *Id.* at 568:22–25 ("Q. Okay.  Throughout

7    your entire time working for Ms. Yang and Mr. Wu, did you ever come to understand what the

8    company did, what [1]855Lawyers did?  A. No.").

9         The I-9 Forms of Gonzalez and Barragan were both presented to the jury.  *Id.* at 547:8–20

10    (discussing Barragan I-9 Form and the statement that Barragan was employed by 1-855-Lawyers);

11    *id.* at 744:3–7 (discussing Gonzalez I-9 Form and the statement that Gonzalez was employed by 1-

12    855-Lawyers).  In fact, the government specifically referenced Barragan's I-9 Form during closing

13    argument as evidence that Defendants Yang and Wu were guilty of Count Two of the Superseding

14    Indictment.  ECF No. 363 at 2419:15–16 ("And there's a, for example, a false I-9, which is Belen

15    Barragan's I-9.  That's at page 1125.").  In light of the foregoing testimony, a rational jury could

16    have concluded that the statements contained within the I-9 Forms of Gonzalez and Barragan that

17    the two individuals were employed to work at 1-855-Lawyers were false.

18         Gonzalez's and Barragan's I-9 Forms were contained within Shengliang Yang's I-829

19    petition filed on or about August 15, 2011, as specified by the Superseding Indictment.  SI ¶ 36

20    (charging visa fraud based on misrepresentations in "I-829 Petition and Supporting Documents for

21    Investor S.Y.," filed on or about August 15, 2011); Trial Ex. 71 at 625.  However, in any event,

22    the government's expert also testified that an I-829 petition is not a "static document that's frozen

23    in time on the date of its submission."  ECF No. 353 at 428:4–12.  Thus, "from the time of filing

24    through final adjudication, [USCIS] accept[s] any additional evidence filed by the petitioner,"

25    which is incorporated into the I-829 petition.  *Id.*

26         Defendant Wu swore under penalty of perjury as to the truth of the fraudulent statements

27

28

Case No. 16-CR-00334-LHK
AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING
MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

1   contained within Gonzalez's and Barragan's I-9 Forms.  Trial Ex. 71 at 1125, 1129.  The

2   government also elicited expert USCIS testimony that the I-9 Forms were required by USCIS as

3   part of the EB-5 process.  ECF No. 353 at 385:7 (explaining that witness served as "subject matter

4   expert for stand alone EB-5 petitions"); *id.* at 427:17–23 ("Q. I think you mentioned earlier that

5   you had been involved in the adjudication of a thousand or more EB-5 stand alone petitions.  Is

6   that correct?  A. Yes.  Q. In that set, how many of those, if you remember, were successfully

7   granted without including I-9 Forms?  A. I can't think of any.").  Finally, the government argued,

8   and put forth sufficient evidence to show, that Defendant Yang aided and abetted Defendant Wu in

9   making the false statements on the I-9 Forms.  *See, e.g.*, ECF No. 363 at 2419:20–25 ("The

10  defendants may argue to you that it was only Daniel Wu that [signed the I-9 Forms] and not Ms.

11  Yang.  But you were instructed, and I anticipate that you'll have this instruction with you, that if

12  one defendant aided and abetted the other in the commission of a crime, that is sufficient to find

13  that they, too, committed the crime.").

14      The Ninth Circuit has specified that a variance only occurs when "the charging terms of

15  the indictment are left unaltered, but the evidence offered at trial proves facts materially different

16  from those alleged in the indictment."  *United States v. Hartz*, 458 F.3d 1011, 1020 (9th Cir.

17  2006).  In the instant case, as the foregoing demonstrates, the government put forth sufficient

18  evidence to prove the facts alleged in the Superseding Indictment as to Count Two.  *See, e.g.*,

19  *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (explaining that "when

20  faced with a record of historical facts that supports conflicting inferences, a reviewing court must

21  presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any

22  such conflicts in favor of the prosecution, and must defer to that resolution" (internal quotation

23  marks and citation omitted)).  Thus, there was no variance as to Count Two of the Superseding

24  Indictment.  *See, e.g.*, *United States v. Antonakeas*, 255 F.3d 714, 722 (9th Cir. 2001) (explaining

25  that there was no variance because "the evidence adduced and theories asserted at Appellant's trial

26  covered the facts and time frame alleged in his indictment").

27                                                        11

28  Case No. 16-CR-00334-LHK
    AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING
    MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

Accordingly, the Court DENIES Defendants Yang and Wu's motion for judgment of acquittal on Count Two of the Superseding Indictment.  The Court now turns to Defendants Yang and Wu's motion for judgment of acquittal on Count Seven of the Superseding Indictment.

### B.  Motion for Judgment of Acquittal on Count Seven of the Superseding Indictment

The jury also unanimously found Defendants Yang and Wu to be guilty of Count Seven of the Superseding Indictment, which charged the offense of aggravated identity theft, 18 U.S.C. § 1028A.  SI ¶¶ 39–40.  The aggravated identity theft statute, 18 U.S.C. § 1028A, dictates that "[w]hoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years."  18 U.S.C. § 1028A(a)(1).  The "felony violation[s] enumerated in subsection (c)" include mail fraud.  18 U.S.C. § 1028A(c).

The Superseding Indictment alleges that Defendants Yang and Wu committed aggravated identity theft in the "I-829 Petition and Supporting Documents for Investor S.Y.," but the Superseding Indictment does not specify the third-party victim.  SI ¶¶ 39–40.  However, the verdict form specifies that the jury found Defendants Yang and Wu guilty of aggravated identity theft through "the use of *William Gonzalez's identity* in the I-829 Petition and Supporting Documents for Investor Shengliang Yang during and in relation to committing mail fraud."  ECF No. 305 at 4 (emphasis added).

According to Defendants Yang and Wu, none of Defendants Yang and Wu's misrepresentations as to Gonzalez "qualify as 'uses' of a means of identification" under 18 U.S.C. § 1028A.  Count Seven Mot. at 5.  The government argues in response that through these misrepresentations, Defendants Yang and Wu "'purported to take . . . action on [Gonzalez's] behalf through impersonation or forgery.'"  Count Seven Opp'n at 9 (quoting *Hong*, 938 F.3d at 1051 n.8).  The Court first briefly discusses the EB-5 job creation requirement and its connection to Defendants Yang and Wu's scheme.  The Court then discusses numerous misrepresentations as

12

United States District Court
Northern District of California

1    to Gonzalez contained within Shengliang Yang's I-829 petition and supporting documents.  The

2    Court then analyzes whether these misrepresentations amount to "uses" of Gonzalez's identity

3    under the aggravated identity theft statute.

4        **1. EB-5 Job Creation Requirements and Defendants Yang and Wu's Scheme**

5        In order to qualify for the EB-5 program, an investor must demonstrate that his investment

6    has created ten or more jobs before USCIS will grant the investor full LPR status.  SI ¶ 11.

7    Indeed, "the core component of the [EB-5] process is job creation."  ECF No. 363 at 2367:10.  In

8    light of the importance of job creation, the EB-5 program imposes numerous restrictions on the

9    jobs that qualify.

10        The ten jobs created by an investor must be permanent and full-time; seasonal and

11   temporary employment does not qualify.  *Id.* at 2367:13–14; Count Seven Opp'n at 2.  Further, the

12   government's expert explained that EB-5 petitioners generally only have two years, or at most

13   three years, to create the required ten jobs.  ECF No. 353 at 433:10–22 (explaining that there are

14   "two years from 528 to 829 for job creation," but that USCIS also "allow[s petitioners] an extra

15   year").  Further, in order for a job to count toward the requirement, the relevant position generally

16   must be filled when the petition is filed.  *Id.* at 433:23–24 ("Generally speaking, open positions on

17   paper are not going to qualify.").  If fewer than ten positions alleged to satisfy the job creation

18   requirement are filled, USCIS will request additional information from the EB-5 petitioner in

19   order to determine whether ten jobs were actually created.  *Id.* at 436:10–18 (explaining that if

20   fewer than ten positions are filled at a new commercial enterprise at the time of an I-829 petition,

21   that "would cause us to send a request for additional evidence to obtain an explanation, as well as

22   any evidence to establish that ten full-time positions have actually been created").  Moreover, if

23   one of the positions that is offered to USCIS to satisfy the requirements has been vacant for a long

24   period, USCIS will likely question whether the position is in fact necessary.  *Id.* at 436:6–9 ("But

25   if I see positions that are open for long periods of time and people are kind of moving around, that

26   absolutely leads me to question whether there is a need for full-time positions in that [new

27

28
     Case No. 16-CR-00334-LHK
     AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING
     MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

1    commercial enterprise]."").

2         Defendant Yang is an attorney who had her own practice located in the Bay Area and who

3    specialized in immigration law.  ECF No. 353 at 334:12–13.  Defendant Wu was Defendant

4    Yang's former husband.  *Id.* at 334:16–17.  Together, Defendants Yang and Wu executed a

5    scheme whereby they solicited money from investors and submitted fraudulent EB-5 petitions to

6    USCIS on behalf of those investors.  Defendant Yang worked to recruit potential investors for the

7    scheme.  For instance, Defendant Yang hosted seminars on immigration law topics in order to

8    attract "people who were interested in possibly obtaining visas, like the EB-5 visa."  ECF No. 354

9    at 656:11–13.  Defendants Yang and Wu then used numerous alleged companies to execute the

10   scheme.  Defendant Yang hired some employees.  *E.g.*, ECF No. 354 at 738:2–19 (explaining that

11   Defendant Yang conducted Gonzalez's job interview).  Defendant Yang then managed these

12   employees.  *E.g.*, ECF No. 354 at 647:12–15, 648:20–23 (explaining that employee Angie Yin

13   reported to Defendant Yang); ECF No. 355 at 880:4–7 (explaining that Defendant Yang was

14   "always on call" for a company, and was "very busy" there); *id.* at 888:3–7 (explaining employee

15   Jack Tien reported to Defendant Yang).  Defendant Yang interfaced with the investors and drafted

16   fraudulent EB-5 petitions that were submitted to USCIS.  *E.g.*, ECF No. 357 at 1242:3-7

17   (discussing investor call with Yang regarding creation of ten required jobs); ECF No. 362 at

18   2325:1–10 (reviewing email to Henry Nunez, an immigration lawyer, stating that Defendant Yang

19   will email completed Shengliang Yang form I-829 petition and cover letter for Nunez to sign

20   before impeding deadline).

21        Defendant Wu, in turn, performed accounting and payroll work for the companies.  *E.g.*,

22   ECF No. 359 at 1655:24–1656:7 ("Daniel Wu was H.R., the person in H.R.  Also, in addition he

23   was our accountant [in Faayou].").  In order to satisfy the job creation requirements for multiple

24   petitioners and multiple EB-5 petitions, Defendants Yang and Wu misrepresented that the same

25   individual was a permanent, full-time employee at multiple companies to create the appearance

26   that each EB-5 petitioner's investment had created 10 permanent, full-time jobs.  Defendants Yang

27

28   Case No. 16-CR-00334-LHK
     AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING
     MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

14

and Wu even misrepresented that they themselves were employees of multiple companies.

For example, as to Gonzalez, Defendants Yang and Wu represented to USCIS that Gonzalez worked for both 1-855-Lawyers and A-Legal Forms, Inc. and created W-2 Forms for Gonzalez for both companies.  Trial Ex. 14A at 2; *see also* ECF No. 355 at 797:4–798:13 (discussing multiple W-2 Forms).  However, Gonzalez did not understand himself to be an employee of two different companies, and Gonzalez never agreed to work for two different companies.  *Id.* ("Q. When you went to work for the company, did you understand that you were working for two different companies at the same time?  A. No.  There was no discussion of that kind, no.  Q. Did you ever agree to work for two different companies at the same time?  A. No.").  As discussed earlier, Gonzalez had never agreed to work for and did not understand that he worked for 1-855-Lawyers.

Along the same lines, Eugene Jun Xiao had a longstanding business relationship with Defendants Yang and Wu.  ECF No. 359 at 1777:18–21 ("Q. Thank you.  You started working with Ms. Yang on these companies around 2005; is that right?  A. Yes.").  Moreover, Xiao served in numerous high-ranking roles at the companies associated with Defendants Yang and Wu.  Xiao served as CEO of Faayou, 81Law, Inc., and A-Legal Forms, Inc., as well as Sales Vice President of 1-855-Lawyers.  Trial Ex. 70 at 192 (CEO of 81Law, Inc.); Trial Ex. 71 at 1057, 1058 (Sales Vice President of 1-855-Lawyers); Trial Ex. 73A at 233 (CEO of Faayou); Trial Ex. 1002A at 14 (CEO of A-Legal Forms).

Notwithstanding the foregoing, Xiao could not identify for which company he worked or for which company Defendants Yang and Wu worked.  Not only was Xiao unable to identify for which company he worked for nine years from 2005 to 2013, but Xiao also could not identify whether Xiao worked for one company or multiple companies.  *See, e.g.*, ECF No. 359 at 1784:8–11 ("A. But I don't remember which company.  Q. Did you work for all three, or only one?  A. Well, they were all together.  Their business, business lines were mixed together.  I don't remember which one.").  Indeed, according to Xiao, "three companies [i.e., 1-855-Lawyers, A-

15

United States District Court
Northern District of California

Legal Forms, Inc., and 81Law, Inc.] were mixed together, they were not separate because we were a web company.  It was very hard for me to tell you if I worked in legal forms or the legal news or the documents."  ECF No. 359 at 1784:22–25.

Xiao also could not identify for which entity Defendants Yang and Wu worked between 2009 and 2014.  *Id.* at 1791:7–9, 12–15 (explaining that "when you ask me which year or which month she [Defendant Yang] worked for, which entity she worked for during a particular year and [sic] there's no way I can answer for you").  When the government asked Xiao to identify which of the companies associated with Defendants Yang and Wu employed Defendant Yang, Xiao replied that "[t]hose questions of yours are really good questions," but "there's no way I can answer for you."  *Id.* at 1791:2–3, 7–9.  The same was true for Defendant Wu.  *Id.* at 1791:12–15 ("Q. All right.  If I ask you the same questions about Daniel Wu, are you going to have the same answers for years 2014 through 2009?  A. Yes.").

In addition to the above misrepresentations, Defendants Yang and Wu made many more misrepresentations to further their scheme.  Below, the Court discusses numerous misrepresentations about Gonzalez contained within Shengliang Yang's I-829 petition and supporting documents designed to mislead USCIS to believe that these job creation requirements were fulfilled.

### 2.  Misrepresentations About Gonzalez in Shengliang Yang's I-829 Petition and Supporting Documents

The Court now describes five misrepresentations made by Defendants Yang and Wu about Gonzalez in Shengliang Yang's I-829 petition and supporting documents.  As noted above, Defendants Yang and Wu made the foregoing misrepresentations about Gonzalez in order to successfully provide USCIS with "[e]vidence of 10 full-time qualifying employees created" in order to satisfy the EB-5 requirements.  Trial Ex. 71 at 625 (listing organizational charts, payroll records, and Forms I-9 as "[e]vidence of 10 full-time qualifying employees created"); *id.* at 1277 (listing organizational charts, payroll records, Forms I-9, and tax return as evidence that "clearly show[s] that 10 full-time permanent jobs have been created by the petitioner's investment").

16

United States District Court
Northern District of California

### a.  Misrepresentation 1: Misrepresentation as to the Identity of Gonzalez's Employer

First, across numerous documents in Shengliang Yang's I-829 petition and supporting documents, Defendants Yang and Wu claimed that Gonzalez worked for 1-855-Lawyers.  For instance, Shengliang Yang's I-829 petition contained an I-9 Form, proof of eligibility to be employed in the United States, in which Defendant Wu declared under penalty of perjury that Gonzalez worked at 1-855-Lawyers.  Trial Ex. 71 at 1129.  However, at trial Gonzalez testified that he understood that he worked for Faayou and/or A-Legal Forms from August 29, 2011 to September 28 or 29, 2011.  ECF No. 354 at 737:6–739:23 ("I remember the names [of the company that employed Gonzalez] were either Faayou.com or A Legal Forms."); *id.* at 743:22–23 (explaining that Gonzalez's start date was August 29, 2011); *id.* at 758:12–16 (explaining that Gonzalez's end date was "either September 28th or 29th").  Gonzalez had not heard of, and had never agreed to work for 1-855-Lawyers.  *Id.* at 744:15-17; 745:14–16 (testifying that Gonzalez never "agree[d] to work for a company specifically called 1855Lawyers").

Gonzalez also understood that he would work for Faayou and/or A-Legal Forms when Gonzalez signed his I-9 Form on August 7, 2011.  ECF No. 354 at 742:11–746:7 (explaining that "the only specific instruction" Gonzalez received concerning the job was that Gonzalez would "be given telephone numbers of attorneys and to make cold calls to try to recruit them into the program of Faayou.com or A Legal Forms").  When Gonzalez signed the I-9 Form, the employer's portion of the form was blank.  *Id.* at 744:8–14 ("My understanding is that I submitted [the I-9 Form] with the top portion filled out and that the rest would be completed by the employer."); ECF No. 355 at 840:16–841:7 ("Q. When you signed that [I-9] Form, was the employer information filled in at the bottom?  A. No.").  Gonzalez never saw his I-9 Form with the employer portion filled out with the 1-855-Lawyers information until the prosecution of Defendants Yang and Wu.  *Id.* (testifying that Gonzalez did not see the "I-9 Form with the [1]855Lawyers information filled in at the bottom" until the prosecution of Defendants Yang and Wu).  After starting his job, Gonzalez received instructions regarding Faayou and A-Legal Forms.

17

ECF No. 354 at 746:1–7 (testifying that after starting work, Gonzalez received specific instructions regarding Faayou.com and A-Legal Forms).

Moreover, Defendant Yang introduced at trial Gonzalez's August 30 and 31, 2011 emails to Defendants Yang and Wu in which Gonzalez identified himself as "Regional Sales Manager, Faayou.com." ECF No. 355 at 825:10–827:4 ("Q. Okay.  And I'd like to focus you to the bottom of that e-mail.  Can you tell the jury what that says?  A. 'Regional Sales Manager, Faayou.com.'"). Defendants Yang and Wu never corrected Gonzalez that Gonzalez's employer was actually 1-855-Lawyers.  *Id.* at 844:15–18 ("Q. The question was, in response to those e-mails, did Ms. Yang or Mr. Wu ever correct you and say, 'No, actually, your employer is 1855Lawyers?'  A. No.").

### b.  Misrepresentation 2: Misrepresentation as to the Dates of Gonzalez's Employment

Second, Defendants Yang and Wu misrepresented the dates of Gonzalez's employment. Gonzalez testified that Gonzalez's employment with Defendants Yang and Wu did not begin until August 29, 2011.  ECF No. 354 at 753:22–23 ("Q. Okay.  What was your start date with the company?  A. August 29th, 2011.").   Defendants Yang and Wu represented that Gonzalez began employment before this date, however.  Shengliang Yang's I-829 petition contained three copies of an organizational chart that identified Gonzalez as an employee "[a]s on 07/31/2011."  Trial Ex. 71 at 1371, 1511, 1535 (listing Gonzalez as employee of 1-855-Lawyers "[a]s on 07/31/2011"). However, on Gonzalez's I-9 Form, Defendant Wu swore under penalty of perjury that Gonzalez began employment with Defendants Yang and Wu on August 8, 2011.  *Id.* at 1129.  Gonzalez also testified that Gonzalez's employment with Defendants Yang and Wu terminated on either September 28 or 29, 2011.  ECF No. 354 at 758:12–16 (explaining that Gonzalez's end date was "either September 28th or 29th").  However, Defendants Yang and Wu represented that Gonzalez received 2,000 shares in 1-855-Lawyers on December 31, 2011, more than three months after the date that Gonzalez's employment terminated.  Trial Ex. 71 at 1502, 1507.

### c.  Misrepresentation 3: Misrepresentation as to Gonzalez's Supervisees

Third, Defendants Yang and Wu misrepresented the fact that Gonzalez supervised other

Case No. 16-CR-00334-LHK
AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING
MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

employees.  Indeed, the organizational charts contained within Shengliang Yang's I-829 petition listed Gonzalez as "Regional Manager" and identified numerous employees who purportedly worked for Gonzalez as direct reports.  Trial Ex. 71 at 1371, 1511, 1535 (listing five employees below Gonzalez as direct reports).  One of these employees, Donghui Luo, was listed as a "Vice Regional Manager" who worked directly below Gonzalez.  *Id.*  Gonzalez testified that Gonzalez did not know Donghui Luo, nor did Gonzalez know that Gonzalez was supposed to supervise a "Vice Regional Manager" during his employment.  ECF No. 354 at 760:7–10 ("Well, for example, I had no idea that I would be, or was, supervising a Vice Regional Manager or that there was a sales team underneath that I would—was managing.  This is all new to me.  I had no idea of that.").  In fact, Gonzalez did not supervise anyone while he worked for Defendants Yang and Wu.  *Id.* at 760:11–15 ("Q. Okay.  Well, let me—let me ask you, were you supervising anyone during your time at the company?  A. No, sir.  Q. A single person?  A. No, sir.").  Gonzalez explained that Gonzalez did not recognize any of the names on the organizational charts, including his own purported supervisees.  *Id.* at 762:1–2 ("I don't recognize any names on this page other than mine and Daniel Wu's.").

Jack Tien also was listed as a supervisee of Gonzalez in the organizational charts.  Trial Ex. 71 at 1371, 1511, 1535 (listing Jack Tien as employee of 1-855-Lawyers below Gonzalez).  However, Tien testified that Tien was not in fact supervised by Gonzalez.  ECF No. 355 at 887:3–6 ("Q. So if this chart indicates that in August 2011 you were a member of a sales team at the company being supervised by William Gonzalez, is that information true or false?  A. That would be false.").  Indeed, Tien explained that Tien never met or had any contact with Gonzalez.  *Id.* at 886:25–887:2 ("Q. Okay.  During your time at the company, did you ever have any contact at all with somebody named William Gonzalez?  A. Never.").

Similarly, Belen Barragan was listed as an office clerk for 1-855-Lawyers in the organizational charts and a payroll document.  Ex. 71 at 1057, 1371, 1511, 1535.  However, Barragan testified that Barragan did not know Gonzalez and had never worked with him.  ECF

United States District Court
Northern District of California

354 at 554:23–555:2 ("Q. Okay.  Thank you.  And, again, as to the other names on this list, the name William Gonzalez, does that name mean anything to you?  A. No.   Q. Did you ever work with him?  A. No.").  Further, similar to Gonzalez, Patrick Stafford was listed as a "Regional Manager" of 1-855-Lawyers in an organizational chart contained within a different EB-5 petitioner's I-829 petition.  Trial Ex. 67 at 751.  However, Stafford testified that he never knew Gonzalez, never took over for Gonzalez, and never received training from Gonzalez.  ECF No. 356 at 1158:9–16 ("Do you see the name William Gonzalez, Regional Manager [in the organizational chart]?  A. Yes.  Q. Did you ever know him?  A. No.  Q. Did you ever assume his duties?  A. No.  Q. Did he ever train you?  A. No.").

### d.  Misrepresentation 4: Misrepresentation as to Gonzalez's Supervisor

Fourth, Defendants Yang and Wu misrepresented the fact that Gonzalez was supervised by employee Eugene Jun Xiao.  Specifically, on a payroll document included in Shengliang Yang's I-829 petition, Defendants Yang and Wu listed Eugene Jun Xiao as the "Sales Vice President," to whom Gonzalez purportedly reported.  Trial Ex. 71 at 1057.  However, at trial, Gonzalez explained that Gonzalez did not report to Eugene Jun Xiao.  ECF No. 354 at 766:4–5 ("Q. [] Did you report to anyone named Eugene Jun Xiao?  A. No, sir.").  Instead, Gonzalez reported only to Defendants Yang and Wu.  *Id.* at 766:6–13 (explaining that Gonzalez "treated both of them [*i.e.*, Defendants Yang and Wu] as my supervisors").

### e.  Misrepresentation 5: Misrepresentation as to Stock Transaction Involving Gonzalez

Fifth, Defendants Yang and Wu included two copies of a document entitled "1-855-Lawyers Inc. Employees Stock Transfer Ledger in Dec. 2011" ("stock ledger") in Shengliang Yang's I-829 petition.  Trial Ex. 71 at 1502, 1507.  The stock ledger falsely indicated that on August 1, 2011, Gonzalez paid $2,000 to receive 2,000 shares of 1-855-Lawyers worth a dollar each.  *Id.*  Gonzalez testified that he never requested stock from, or discussed the possibility of receiving stock with, Defendants Yang and Wu.  ECF No. 355 at 799:1–8 ("Q. Did you ever discuss the possibility of receiving stock with either Ms. Yang or Mr. Wu?  A. No.  Q. Did you

20

United States District Court
Northern District of California

ever ask for stock in the company [1-855-Lawyers]?  A. No.").  Gonzalez never knew the

company even issued stock.  *Id.* ("Q. Did you even know that the company—or did you know

whether the company [1-855-Lawyers] issued stock?  A. No, I didn't.  I have no idea.").

Gonzalez never received 2,000 shares of 1-855-Lawyers stock, never paid for the stock,

and was never given a stock certificate or any record reflecting ownership of the shares.  *Id.* at

801:9–22 (explaining that Gonzalez did not "receive 2,000 shares of stock in the company

1855Lawyers," Gonzalez did not "ever pay $2,000 for shares in the company 1855Lawyers," and

Gonzalez was never "given a stock certificate or any other record reflecting [Gonzalez's]

ownership of shares in the company").

The stock ledger was dated December 2011, months after Gonzalez left employment with

Defendants Yang and Wu in September 2011, and stated that the shares were issued on August 1,

2011, even though Defendant Wu swore under penalty of perjury on Gonzalez's I-9 Form that

Gonzalez began employment with Defendants Yang and Wu on August 8, 2011.  Trial Ex. 71 at

1129.  The alleged August 1, 2011 stock issuance date is also before Gonzalez signed the I-9 Form

on August 7, 2011 and before Gonzalez began working with Defendants Yang and Wu on August

29, 2011.  *Id.* at 799:19–801:2 (explaining that "in December of 2011," Gonzalez was not "still

working for [1]855Lawyers," and noting that "under date shares issued, the date [on the stock

ledger] is August 1st 2011").  The stock ledger used Gonzalez's name and 2011 home address.  *Id.*

at 800:13–24 ("Q. Okay.  What is the name listed under the first column there?  A. My name,

William Gonzalez.  Q. Okay.  And do you see the address information next to it?   A. Yes.").

The shares were separately declared to the Internal Revenue Service as income, which

resulted in a tax liability for Gonzalez.  *Id.* at 796:10–20 (explaining that Gonzalez incurred tax

liability as a result of Gonzalez's stock ownership).  Gonzalez received a Form 1099 from 1-855-

Lawyers that showed miscellaneous income of $2,000 in the form of "nonemployee

compensation" that was never paid to him.  Trial Ex. 14A at 1 (Form 1099 listing miscellaneous

compensation of $2,000 to Gonzalez).

Case No. 16-CR-00334-LHK
AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING
MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

Gonzalez reached out to Defendants Yang and Wu for a correction, but neither corrected the issue. ECF No. 354 at 766:14–771:4 ("Q. And did Ms. Yang or Mr. Wu ever correct the issue for you? A. No, sir."). Gonzalez was concerned that because he had not received the $2,000 income or reported it in his tax return, the Form 1099 would result in more tax liability and provoke a tax audit. *Id.* at 770:16–22 (explaining that Gonzalez was worried that the Form 1099 would result in Gonzalez "paying more taxes than I should be paying" or would risk "provoking an audit").

Gonzalez received advice from the Internal Revenue Service and H&R Block, both of which instructed Gonzalez to either submit a letter from his employer stating that the Form 1099 was a mistake or to pay the tax. ECF No. 355 at 796:6–9 ("I got advice from the IRS and H&R Block, and I was told that in order to resolve it, I had to, well, either submit a letter from my employer stating that it was a mistake; or, you know, pay the tax."). Gonzalez tried to secure such a letter from Defendants Yang and Wu, but was unable to do so. *Id.* at 769:10–20 ("I tried very hard to get that letter and didn't . . . ."). As a result, Gonzalez amended his tax return to include the Form 1099 income and paid an additional tax. *Id.* ("I paid additional tax. That's all I could do not having the letter.").

The Court now addresses whether the foregoing misrepresentations amount to "uses" of Gonzalez's identity for the purposes of the aggravated identity theft statute. The Court begins by analyzing the first four misrepresentations, before turning to the fifth misrepresentations.

### 3.  The First, Second, Third, and Fourth Misrepresentations Do Not Constitute "Uses" of Gonzalez's Identity Under the Aggravated Identity Theft Statute

According to the government, when Defendants Yang and Wu made the first four misrepresentations outlined above, Defendants Yang and Wu "essentially accepted employment on behalf of Gonzalez[]" and thereby "made Gonzalez an employee of a company he never joined (1-855-Lawyers)." Count Seven Opp'n at 9, 13. Accordingly, the government contends that with these misrepresentations, Defendants Yang and Wu "'purported to take . . . action on [Gonzalez's] behalf through impersonation or forgery.'" Count Seven Opp'n at 9 (quoting *United States v.*

22

United States District Court
Northern District of California

1    *Hong*, 938 F.3d 1040, 1051 n.8 (9th Cir. 2019)).  The Court disagrees.

2          The Ninth Circuit examined the nature of the "uses" element of aggravated identity theft in

3    two recent cases.  The Ninth Circuit first addressed the scope of the "uses" element of aggravated

4    identity theft in *United States v. Hong*, 938 F.3d 1040 (9th Cir. 2019).  In *Hong*, the defendant, an

5    owner of several massage and acupuncture clinics, misrepresented massages and acupuncture that

6    patients received as physical therapy in order to be eligible for Medicare reimbursement and thus

7    commit Medicare fraud.  *Id.* at 1051.  The Ninth Circuit relied on several out-of-circuit lines of

8    cases to hold that these misrepresentations did not constitute "uses" of a means of identification

9    for the purposes of the aggravated identity theft statute.  *Id.* at 1050–51.  Accordingly, the Ninth

10   Circuit reversed the aggravated identity theft convictions.  *Id.*

11         The Ninth Circuit again addressed the "uses" element of the aggravated identity theft in

12   *United States v. Gagarin*, 950 F.3d 596 (9th Cir. 2020).  In *Gagarin*, the Ninth Circuit construed

13   *Hong* to hold that a defendant "uses" a means of identification for the purposes of aggravated

14   identity theft within the Ninth Circuit if the defendant attempts to pass themselves off as the third

15   party.  *Id.* at 603 ("We reasoned that neither Hong nor the physical therapists complicit in his

16   scheme attempted to pass themselves off as patients." (internal quotation marks and alterations

17   omitted)).  A defendant also "uses" a means of identification if the defendant purports to take an

18   action on the third party's behalf through impersonation or forgery.  *Id.* ("Nor did [the defendant

19   in *Hong*] purport to take some other action on another person's behalf through impersonation or

20   forgery." (internal quotation marks and alterations omitted)).

21         In *Gagarin*, the defendant forged a victim's signature on an insurance application, which

22   falsely conveyed that the victim herself had certified the application.  *Id.* at 603–04.  The Ninth

23   Circuit held that the defendant therefore "purported to take action on behalf of [the victim], and in

24   so doing used [the victim's] identity to further the fraudulent insurance application."  *Id.* at 603.

25   The Ninth Circuit also held that the defendant "'attempt[ed] to pass [herself] off'" as the victim

26   "through forgery and impersonation."  *Id.* at 604 (quoting *Hong*, 938 F.3d at 1051).  Accordingly,

27                                                    23

United States District Court
Northern District of California

1    the Ninth Circuit affirmed the defendant's aggravated identity theft convictions.  *Id.*

2        Following the Ninth Circuit's decisions in *Hong* and *Gagarin*, where a defendant provides

3    a service "to [victims] . . . , and then participate[s] in a scheme where that [service is]

4    misrepresented," a defendant does not "use" a victim's identity for the purposes of the aggravated

5    identity theft statute.  *See Hong*, 938 F.3d at 1050.   This is so because when a defendant only

6    misrepresents "how and why" a victim received an actual service, the victim's identity does not

7    further or facilitate fraud.  *See id.* ("Critically, the defendants 'did not attempt to pass themselves

8    off as anyone other than themselves.  [They] misrepresented *how and why* the beneficiaries were

9    transported, but they did not use those beneficiaries' identities to do so.'" (quoting *United States v.*

10   *Medlock*, 792 F.3d 700, 707 (6th Cir. 2015) (emphasis and alteration in original)).

11       In both *Hong* and *Gagarin*, the Ninth Circuit approvingly cited an example provided by the

12   Sixth Circuit that illustrates this point.  According to the Ninth Circuit, if a pharmacist commits

13   fraud only by inflating the *amount of drugs* prescribed to an actual victim, the pharmacist does not

14   "use" a victim's identity under the aggravated identity theft statute.  By contrast, if a pharmacist

15   uses a victim's identity to fashion "'a fraudulent submission out of whole cloth,'" the pharmacist

16   *does* use the victim's identity under the aggravated identity theft statute.  *See Gagarin*, 950 F.3d at

17   603 n.1 (citing example from *Michael*); *Hong*, 938 F.3d at 1050 (same).

18       The foregoing case law resolves the question of whether Defendants Yang and Wu "used"

19   Gonzalez's identity with respect to the first four misrepresentations.  The Court begins with the

20   first misrepresentation.  The first misrepresentation concerns the identity of the company that

21   employed Gonzalez (*i.e.*, 1-855-Lawyers, as opposed to Faayou and/or A-Legal Forms).  It is

22   possible to argue that this misrepresentation was fashioned by Defendants Yang and Wu "'out of

23   whole cloth,'" because Gonzalez was never employed by 1-855-Lawyers.  *See Gagarin*, 950 F.3d

24   at 603 n.1 (citing example from *Michael*).

25       However, the record unequivocally demonstrates that Gonzalez was in fact employed by

26   Defendants Yang and Wu.  *See, e.g.*, ECF No. 354 at 735:18–20 ("Q. Was there a time when you

27                                                         24

United States District Court
Northern District of California

worked for a business owned by either Jennifer Yang or Daniel Wu?  A. Yes.").  The identity of the precise business that employed Gonzalez is most naturally framed as a misrepresentation concerning "how and why" Defendants Yang and Wu in fact employed Gonzalez.  In other words, by misrepresenting the name of the business that employed Gonzalez, Defendants Yang and Wu "provided [employment to Gonzalez], and then participated in a scheme where that [employment] was misrepresented as [sufficient to satisfy EB-5 requirements]."  *Hong*, 938 F.3d at 1051.  Under Ninth Circuit case law, this does not amount to the "use" of a victim's identity for the purposes of the aggravated identity theft statute.

The second, third, and fourth misrepresentations are even more straightforward than the first.  Indeed, the second, third, and fourth misrepresentations concern the dates of Gonzalez's employment, as well as Gonzalez's supervisor and supervisees.  As with the first misrepresentation, the second, third, and fourth misrepresentations concern the details of employment that was in fact provided to Gonzalez.  These misrepresentations therefore address the "how and why" of employment that Defendants Yang and Wu provided to Gonzalez, and thus cannot amount to "uses" of Gonzalez's identity for the purposes of the aggravated identity theft statute.  *See, e.g.*, *Gagarin*, 950 F.3d at 603 n.1 (citing example from *Michael*); *Hong*, 938 F.3d at 1050 (same).

The government's theory that with the first four misrepresentations outlined above, Defendants Yang and Wu "essentially accepted employment on behalf of Gonzalez[]" and thereby "made Gonzalez an employee of a company he never joined (1-855-Lawyers)" suffers from several further defects.  Count Seven Opp'n at 9, 13.  First, in *Gagarin*, the Ninth Circuit provided the sole example of a situation in which the Ninth Circuit has thus far held that a defendant "purported to take action on [a victim's] behalf."  950 F.3d at 603.  In *Gagarin*, the defendant signed an insurance application in a victim's name, and thereby falsely created the impression that the victim had certified the application.  *Id.*  The Ninth Circuit explained that when the defendant signed the insurance application in the victim's name, the defendant "purported to take action on

25

1   [her] behalf." *Id.* Unlike the defendant in *Gagarin*, Defendants Yang and Wu did not sign any

2   documents in Gonzalez's name.  Moreover, unlike the defendant in *Gagarin*, Defendants Yang

3   and Wu never attempted to pass themselves off as Gonzalez.  *Id.* at 604 ("Gagarin 'attempt[ed] to

4   pass [herself] off' as her cousin through forgery and impersonation.").

5   Second, the government's theory of aggravated identity theft is in tension with the

6   underlying mail fraud itself.  If the government is correct as to its argument that Defendants Yang

7   and Wu "made Gonzalez an employee of a company he never joined (1-855-Lawyers)" and

8   thereby "essentially accepted employment on behalf of Gonzalez[]," Count Seven Mot. at 9, 13,

9   then it is unclear how representations that Gonzalez was employed by 1-855-Lawyers are false in

10  the first place.  In the absence of mail fraud, however, there can be no aggravated identity theft.

11  *See* ECF No. 305 at 4 (convicting Defendants Yang and Wu of aggravated identity theft through

12  "the use of William Gonzalez's identity in the I-829 Petition and Supporting Documents for

13  Investor Shengliang Yang *during and in relation to committing mail fraud*" (emphasis added)).

14  In light of the foregoing, the first, second, third, and fourth misrepresentations outlined

15  above are insufficient to satisfy the "uses" element of the aggravated identity theft statute.  The

16  Court now turns to the fifth misrepresentation contained within Shengliang Yang's I-829 petition

17  and supporting documents.

### 4.  The Fifth Misrepresentation Does Not Constitute a "Use" of Gonzalez's Identity Under the Aggravated Identity Theft Statute

18

19  As noted, Defendants Yang and Wu included two copies of a document entitled "1-855-

20  Lawyers Inc. Employees Stock Transfer Ledger in Dec. 2011" ("stock ledger") in Shengliang

21  Yang's I-829 petition.  Trial Ex. 71 at 1502, 1507.  The stock ledger falsely indicated that on

22  August 1, 2011, Gonzalez paid $2,000 to receive 2,000 shares of 1-855-Lawyers worth a dollar

23  each. *Id.*  The shares were separately declared to the Internal Revenue Service as income, which

24  resulted in a tax liability for Gonzalez.  *Id.* at 796:10–20 (explaining that Gonzalez incurred tax

25  liability as a result of Gonzalez's stock ownership).

26  According to the government, Defendants Yang and Wu effectively "accepted shares on

27

28  Case No. 16-CR-00334-LHK
AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING
MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

1   [Gonzalez's] behalf" when Defendants Yang and Wu made this misrepresentation.  Count Seven

2   Opp'n at 13.  Thus, as with the first, second, third, and fourth misrepresentations, the government

3   contends that the fifth misrepresentation amounted to an action that Defendants Yang and Wu

4   purported to take on behalf of Gonzalez.  Again, the Court disagrees.

5       As an initial matter, the Court notes that the aggravated identity theft count in the instant

6   case is seemingly limited in scope.  Count Seven of the Superseding Indictment charges

7   Defendants Yang and Wu with the commission of aggravated identity theft within the "I-829

8   Petition and Supporting Documents for Investor S.Y.," during and in relation to mail fraud.  SI ¶¶

9   39–40.  Similarly, the jury found Defendants Yang and Wu guilty "of Aggravated Identity Theft,

10  in violation of Title 18, United States Code, Section 1028A, as to the use of William Gonzalez's

11  identity in the I-829 Petition and Supporting Documents for Investor Shengliang Yang."  ECF No.

12  344 at 4 (emphasis added).

13      The government nonetheless relies on the fact that "[t]he shares were declared to the IRS

14  as income, creating a tax liability for Gonzalez."  Count Seven Opp'n at 11 (emphasis added).

15  The government asserts that "by reporting the share value, $2,000, as income received by

16  Gonzales [sic] to the IRS, [Defendants Yang and Wu] essentially 'accepted' the issuance of shares

17  on Gonzalez' [sic] behalf."  *Id*. at 12 (emphasis added).  As discussed, the government's expert

18  testified that an I-829 petition is not a "static document that's frozen in time on the date of its

19  submission."  ECF No. 353 at 428:4–12.  Thus, "from the time of filing through final adjudication,

20  [USCIS] accept[s] any additional evidence filed by the petitioner," which is incorporated into the

21  I-829 petition.  *Id*.  Here, the Form 1099 that describes Gonzalez's purported 1-855-Lawyer stock

22  receipt was not contained within the I-829 petition for Shengliang Yang, and in light of the

23  foregoing expert testimony, the scope of the I-829 petition's "supporting documents" is unclear.

24  *See, e.g.*, ECF No. 353 at 348:4–6 (arguing that Defendants Yang and Wu committed visa fraud

25  "because they signed false visa petitions or supporting documents in those petitions under penalty

26  of perjury" (emphasis added)).  The Court assumes for the purposes of the instant motion that the

27

28
    Case No. 16-CR-00334-LHK
    AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING
    MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

1  government may rely on the Form 1099 to establish Defendants Yang and Wu's "use of William

2  Gonzalez's identity in the I-829 Petition and Supporting Documents for Investor Shengliang

3  Yang," notwithstanding the fact that the Form 1099 was not submitted to USCIS.  ECF No. 344 at

4  4.

5  Accordingly, the Court must determine whether the two copies of the stock ledger

6  contained within the I-829 petition for Shengliang Yang, as well as the Form 1099 Gonzalez

7  received in connection with the false stock issuance, amount to a "use" of Gonzalez's identity for

8  the purposes of the aggravated identity theft statute.  Trial Ex. 12 at 1; Trial Ex. 71 at 1502, 1507.

9  The misrepresentations contained within these documents present a thornier issue than the first

10  four misrepresentations discussed above.  Indeed, it is difficult to discern precisely how these

11  misrepresentations fit into the Ninth Circuit's guidance as to the "uses" element of aggravated

12  identity theft.

13  In both *Hong* and *Gagarin* the Ninth Circuit approvingly cited the Sixth Circuit's decision

14  in *United States v. Michael*, 882 F.3d 624 (6th Cir. 2018).  In fact, in *Gagarin*, the Ninth Circuit

15  pointed to *Michael* as the case that summarized the Sixth Circuit cases on which the *Hong* court

16  had previously relied.  *Gagarin*, 950 F.3d at 603 (indicating that Michael summarized the "line of

17  cases from the Sixth Circuit" on which the *Hong* court relied).  Under *Michael*, in turn, "'[t]he

18  salient point is whether the defendant used the means of identification to further or facilitate' the

19  predicate felony for the aggravated identity theft charge."  *Gagarin*, 950 F.3d at 603 (quoting

20  *Michael*, 882 F.3d at 627–28).  In *Gagarin*, the Ninth Circuit seemingly incorporated this standard

21  because the Ninth Circuit pointedly concluded that the defendant's "use of [the victim's] means of

22  identification was [] central to the fraud and 'furthered and facilitated' its commission."  *Id.* at

23  604.

24  The Ninth Circuit further explained that under *Michael*, if a pharmacist commits fraud only

25  by inflating the amount of drugs prescribed to an actual victim, the pharmacist does not "use" a

26  victim's identity under the aggravated identity theft statute.  By contrast, if a pharmacist uses a

27

28
Case No. 16-CR-00334-LHK
AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING
MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

victim's identity to fashion "'a fraudulent submission out of whole cloth,'" the pharmacist does use the victim's identity under the aggravated identity theft statute.  *See Gagarin*, 950 F.3d at 603 n.1 (citing example from *Michael*); *Hong*, 938 F.3d at 1050 (same).

Additionally, the Ninth Circuit and numerous other courts have noted that "the use of another person's means of identification makes a fraudulent claim . . . much harder to detect and, therefore, more likely to succeed."  *United States v. Abdelshafi*, 592 F.3d 602, 610 (4th Cir. 2010); *see also Gagarin*, 950 F.3d at 604 (citing *Abdelshafi*).

Unlike the first four misrepresentations discussed above, there is an argument that Defendants Yang and Wu used Gonzalez's identity to fashion a fraudulent submission out of whole cloth as to the fifth misrepresentation.  The stock ledger falsely indicated that on August 1, 2011, Gonzalez paid $2,000 to receive 2,000 shares of 1-855-Lawyers worth a dollar each.  Trial Ex. 71 at 1502, 1507.  However, Gonzalez never paid for the stock, never received 2,000 shares of 1-855-Lawyers stock, and was never given a stock certificate or any record reflecting ownership of the shares.  ECF No. 355 at 801:9–22 (explaining that Gonzalez did not "receive 2,000 shares of stock in the company 1855Lawyers," Gonzalez did not "ever pay $2,000 for shares in the company 1855Lawyers," and Gonzalez was never "given a stock certificate or any other record reflecting [Gonzalez's] ownership of shares in the company").

Furthermore, Gonzalez never requested stock from, or discussed the possibility of receiving stock with, Defendants Yang and Wu.  ECF No. 355 at 799:1–8 ("Q. Did you ever discuss the possibility of receiving stock with either Ms. Yang or Mr. Wu?  A. No.  Q. Did you ever ask for stock in the company [1-855-Lawyers]?  A. No.").  Gonzalez never knew the company even issued stock.  *Id.* ("Q. Did you even know that the company—or did you know whether the company [1-855-Lawyers] issued stock?  A. No, I didn't.  I have no idea.").

Defendants Yang and Wu used Gonzalez's actual name and actual home address in the stock ledger without Gonzalez's knowledge or consent.  Trial Ex. 71 at 1502, 1507.  Similarly, Defendants Yang and Wu used Gonzalez's actual name, actual home address, and actual social

Case No. 16-CR-00334-LHK
AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

security number on the Form 1099 without Gonzalez's knowledge or consent.  Trial Ex. 14A at 1.  The use of Gonzalez's actual name, actual home address, and actual social security number made it more difficult for the authorities to detect Defendants Yang and Wu's fraud than if Defendants Yang and Wu had created a fictitious stock recipient with a fictitious home address and a fictitious social security number.

Thus, it can be argued that Defendants Yang and Wu fashioned fraudulent submissions, the stock ledger and the Form 1099, out of whole cloth.  Moreover, it can be argued that Defendants Yang and Wu's use of Gonzalez's identity was central to the fraud and furthered and facilitated its commission.

The stock misrepresentations thus are distinguishable from the Ninth Circuit's decision in *Hong* and the cases upon which the Ninth Circuit relied in *Hong* and *Gagarin*, namely *United States v. Medlock*, 792 F.3d 700 (6th Cir. 2015), *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017), and the example provided in *Michael*, 882 F.3d 624 (6th Cir. 2018).  In *Hong*, the patients, using their actual names and actual Medicare numbers, consented to and received acupuncture and massage services from Hong's clinics, but Hong misrepresented those services as physical therapy services in order to be eligible for Medicare reimbursement.  *Hong*, 938 F.3d at 1051 ("Hong provided massage services to patients to treat their pain, and then participated in a scheme where that treatment was misrepresented as a Medicare-eligible physical therapy service.").

Similarly, in *Medlock*, the patients, using their actual names and actual Medicare numbers, consented to be and were transported by the Medlocks' ambulance service to kidney dialysis facilities.  *Medlock*, 792 F. 3d at 703–704.  The Medlocks billed the transports as single passenger and "stretcher required" even though some patients walked, were transported by wheelchair, rode in the front seat, or rode with another patient.  *Id.*  In *Medlock*, the Sixth Circuit held that the Medlocks' misrepresentations that certain patients were transported by stretchers did not constitute "use" of those patients' identification "because their company really did transport them."  *Id.* at 708.  The Ninth Circuit in *Hong* quoted this language from *Medlock*: "[They] misrepresented *how*

30

*and why* the beneficiaries were transported, but they did not use those beneficiaries' identities to do so." *Hong*, 938 F.3d at 1050.

In addition, in *Berroa*, doctors who obtained their medical licenses by fraud issued prescriptions to actual patients who consented to the use of their actual names in the prescriptions and who filled out the prescriptions in various pharmacies but were unaware of the doctors' medical license fraud. *Berroa*, 856 F.3d at 155–56. The First Circuit in *Berroa* found that the doctors use of actual patients' actual names in prescriptions that the patients actually filled out at pharmacies did not constitute "use" under the aggravated identity theft statute. *Id.* at 156–57.

In the example in *Michael*, the doctor who only inflates the amount of actual drugs prescribed and dispensed to an actual patient does not fashion a false submission out of whole cloth and does not "use" the patient's means of identification under the aggravated identity theft statute. *Michael*, 882 F.3d at 629.

By contrast, the instant case is not a scenario in which Gonzalez consented to receive and received stock, and Defendants Yang and Wu merely misrepresented the amount of stock Gonzalez received or the how and why Gonzalez received stock. Gonzalez's case is more akin to *United States v. Tevis*, in which the Sixth Circuit found that a bank defrauder's use of a colleague's five-year-old son's social security number in a fraudulent local application for a loan not in the son's name constituted "use" under the aggravated identity theft statute. *Tevis*, 593 F. App'x 473, 478 (6th Cir. 2014).

On the other hand, Defendants Yang and Wu did employ Gonzalez and did compensate Gonzalez for that employment. To the extent that the stock ledger and Form 1099 reported additional compensation (although never paid) to Gonzalez, as the government expressly argued at trial, then the actions of Defendants Yang and Wu resemble those of the pharmacist who merely inflates the amount of drugs dispensed.

Moreover, Defendants Yang and Wu's conduct is not comparable to the defendant's conduct in *Gagarin*. In *Gagarin*, the defendant's scheme was to apply for life insurance on behalf

Case No. 16-CR-00334-LHK
AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING
MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California

of individuals who did not intend to apply for life insurance or know that their identifying information was being used in the applications. *Gagarin*, 950 F.3d at 600–601.  However, in *Gagarin*, the aggravated identity theft victim was the defendant's cousin who had asked the defendant to sign the victim up for a life insurance policy.  *Id.*  The victim, who had worked for some time for the insurance company, asked the defendant to state falsely that metro PCS was the victim's place of employment because the victim worried that she would be denied insurance if the insurance company knew that she was unemployed.  *Id.*  The defendant in Gagarin then forged the victim's signature on an insurance application, which the victim never saw, and thereby "purported to take action on behalf of" that victim.  *Id.* at 603.  Notwithstanding all of the ways in which Defendants Yang and Wu fraudulently used Gonzalez's identity, Defendants Yang and Wu never forged Gonzalez's signature.

Moreover, as the First Circuit has noted, the legislative history of the aggravated identity theft statute suggests that Congress intended the word "use" to have a narrow scope.  The relevant House Report provides examples of aggravated identity theft.  "Notably, each of these examples involved the defendant's use of personal information to pass him or herself off as another person, or the transfer of such information to a third party for use in a similar manner."  *Berroa*, 856 F.3d at 156 (citing H.R. Rep. No. 108-528, at 5–6, *reprinted in* 2004 U.S.C.C.A.N. 781–82).  These examples included "bogus Federal income tax returns in others' names" and use of "stolen identity to apply for and receive Social Security benefits."  *Id.*  The Ninth Circuit approvingly discussed the First Circuit's analysis of the aggravated identity theft statute's legislative history, and the Ninth Circuit relied in part on this analysis to adopt a narrow construction of the statute.  *See Hong*, 938 F.3d at 1051 (recounting the First Circuit's analysis of the legislative history of the aggravated identity theft statute).  However, the legislative history is not conclusive because Gonzalez's Form 1099 is arguably similar to a bogus federal income tax return in others' names.  Nonetheless, the Ninth Circuit has cautioned that "[t]o interpret 'use' broadly 'could encompass every instance of specified criminal misconduct in which the defendant speaks or writes a third

United States District Court
Northern District of California

1  party's name.'" *Id.* (quoting *Berroa*, 856 F.3d at 156).

2       In sum, the applicable authority as to whether Defendants Yang and Wu's fifth

3  misrepresentation about Gonzalez constitutes a "use" for the purposes of the aggravated identity

4  theft statute is unclear.  "Confronted with two reasonable interpretations of 'uses' and no

5  conclusive guidance from the legislative history or case law (this is an issue of first impression),

6  we apply the rule of lenity, which 'requires ambiguous criminal laws to be interpreted in favor of

7  the defendants subjected to them.'"  *United States v. Miller*, 734 F.3d 530, 542 (6th Cir. 2013)

8  (quoting *United States v. Beals*, 698 F.3d 248, 273 (6th Cir. 2012)); *cf. United States v. Spears*,

9  729 F.3d 753, 757 (7th Cir. 2013) (en banc) (explaining that dispute about aggravated identity

10  theft statute's use of the word "another" "must be resolved by the Rule of Lenity, under which

11  conviction is possible only when a law declares in understandable words what is forbidden").  In

12  light of the absence of authority as to the status of the stock misrepresentations, the Court

13  concludes that the aggravated identity theft statute's "use" requirement "is sufficiently ambiguous

14  in this context that the rule of lenity should apply."  *United States v. Millis*, 621 F.3d 914, 918 (9th

15  Cir. 2010).  Accordingly, the Court must resolve the question of the scope of the aggravated

16  identity theft statute against the government.  *Id.* at 916–17.

17       In sum, the Court concludes that the fifth misrepresentation does not constitute a "use" of

18  Gonzalez's identity under the aggravated identity theft statute.  Thus, none of the five foregoing

19  misrepresentations in Shengliang Yang's I-829 petition or supporting documents constitutes a

20  "use" of Gonzalez's identity under the aggravated identity theft statute.  Thus, even viewing the

21  facts in the light most favorable to the prosecution, *Nevils*, 598 F.3d at 1163–64, no rational jury

22  could have concluded that Defendants Yang or Wu "used" Gonzalez's identity in furtherance of

23  mail fraud under 18 U.S.C. § 1028A in the context of Shengliang Yang's I-829 petition.

24  Accordingly, the Court GRANTS Defendants Yang and Wu's motion for judgment of acquittal on

25  Count Seven of the Superseding Indictment.

26  **IV.     CONCLUSION**

27                                                        33

1      For the foregoing reasons, the Court DENIES Defendants Yang and Wu's motion for

2  judgment of acquittal on Count Two of the Superseding Indictment.  The Court GRANTS

3  Defendants Yang and Wu's motion for judgment of acquittal on Count Seven of the Superseding

4  Indictment.

5  **IT IS SO ORDERED.**

6

7  Dated: May 29, 2020

8  _____

9  LUCY H. KOH
   United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                               34

28  Case No. 16-CR-00334-LHK
    AMENDED ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT TWO; GRANTING
    MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT SEVEN

United States District Court
Northern District of California